

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00444-CV

| | | |
|---|---|---|
| In the Interest of A.H., A Child | § | From the 323rd District Court |
| | § | of Tarrant County (323-95486J-11) |
| | § | March 21, 2013 |
| | § | Opinion by Chief Justice Livingston |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's order of termination. It is ordered that the order of termination of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Chief Justice Terrie Livingston



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00444-CV

IN THE INTEREST OF A.H., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In this termination appeal, A.H.'s father, P.H. (Father), contends that the evidence is legally and factually insufficient to support the trial court's findings supporting termination grounds under section 161.001(1) and 161.002 of the family code. A.H.'s mother, C.R. (Mother), contends that the evidence is factually insufficient to support the trial court's best interest finding. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

**Father's Appeal**

The trial court found that Father (1) "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;" (2) "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;" and (3) "constructively abandoned the child."[2]   *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N) (West Supp. 2012).   We need only find the evidence sufficient on one of these grounds to support the trial court's termination order as to Father.   *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

To prove the constructive abandonment ground, the Department of Family and Protective Services had to show that Father

> constructively abandoned the child who ha[d] been in the permanent or temporary managing conservatorship of the Department . . . for not less than six months, and:
>
> (i) the [D]epartment . . . ha[d] made reasonable efforts to return the child to [Father];

---

[2]Based on the trial court's specific findings in the termination order, we cannot discern Father's following argument:  "In this case, the trial court found by clear and convincing evidence that [P.H.] violated Section 161.001(1)(D), (E), and (N).  It did not[,] however, find that P.H. committed any act enumerated in 161.001(1)."  A finding that a parent has violated these specific sections is a finding that the parent committed acts enumerated in section 161.001(1).  We therefore overrule Father's alternative issue.

2

(ii) [Father] ha[d] not regularly visited or maintained significant contact with the child; and

(iii) [Father] ha[d] demonstrated an inability to provide the child with a safe environment[.]

*See* Tex. Fam. Code Ann. § 161.001(1)(N).

Father and Mother were both incarcerated when A.H. was born in October 2011, which is when the Department removed A.H. from Mother.[3]  A.H.'s caseworker testified that she prepared a service plan for Father in November 2011 and that she mailed it to him in jail.  At that time, the caseworker noted in a status report to the court that visitation with Father and Mother was not possible because of their incarceration but that the Department would attempt to arrange visitation with A.H.'s older sibling, who had been adopted by another family.  The caseworker also sent a letter at the same time with her contact information.  Father never contacted her.

Father was released from jail in February 2012.  The caseworker tried contacting him again, but she could not find him, and he did not contact her.  Father was reincarcerated in May 2012 after committing a different criminal offense; he had not contacted the caseworker at all while he was out of jail.  The caseworker testified that had Father contacted her, she would have set up a meeting with him to go over his service plan and set up visitation with A.H.  In contrast, Father had written to a Department investigator in October 2011 asking

---

[3]A.H. was removed from the hospital where Mother delivered him.

about the status of the case and indicating he would seek custody of A.H. upon his release from jail.

A family service plan evaluation filed with the court in August 2012 noted the following concerns with Father "as of 7/25/2012":

1)  Father had never met A.H.;

2)  Father was in jail;

3)  Father had not demonstrated that he was willing to meet A.H.'s needs;

4)  Father had an extensive criminal history;

5)  The Department had not had any contact with Father and it appeared that he was "unwilling to work services towards family reunification"; and

6)  Father did not appear to be willing to put A.H.'s needs ahead of his own.

The Department further noted that

1)  The caseworker had no contact with Father throughout the case;

2)  Father could not meet A.H.'s needs while in jail;

3)  Father had not contacted the caseworker to begin services nor had he begun any services to be reunited with A.H.;

4)  Father had not demonstrated any parenting skills;

5)  Father had not provided any employment or housing information to the caseworker or Department; and

6)  Father would not be released from jail until later in 2012.

The caseworker testified that she attempted to place A.H. with his maternal grandmother and Mother's brother, as well as "a fictive kin family member" of

4

Mother's but that none of those placements were suitable. A.H.'s brother had been adopted but that family was unwilling to take A.H. A.H. had been in foster care since he was born.

The caseworker admitted on cross-examination that she probably should have visited Father in jail, but she also believed her attempts to contact him had been reasonable.

Father testified that the last time he used methamphetamine was in April 2012 while he was out of jail. Father admitted that he had at least seven convictions. He also admitted committing a new theft in March 2012, for which he was incarcerated at the time of trial. He further admitted that he had never seen A.H.

Father said he could not call anyone outside of jail but that he could send a letter. He also said he was in a drug program at jail and was trying to get help with his drug problem. He said he would probably live with his mother in Fort Worth when he was released, which he expected to be October 22, 2012. He admitted getting letters from CPS while he was in jail, but he said he did not understand what he needed to do and would have done things differently if he had received clearer advice. But he also said there was not any reason he failed to contact CPS. Father also admitted that he had received the service plan and read it but that he did not contact anyone upon his release from jail in February 2012 to try to regain custody of his son. When asked why, he said he had no

answer. He agreed that his frequent incarceration had prevented him from parenting his children.

Father contends that the evidence is insufficient to support the constructive abandonment ground because this ground does not apply to incarcerated parents; his argument is that "the Department does not make 'reasonable efforts to return' children to parents when they are in jail." Thus, according to Father, incarceration of a parent precludes termination on this ground.

While imprisonment, standing alone, does not constitute constructive abandonment, *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g), we agree with the Amarillo Court of Appeals's reasoning below:

> [W]e disagree with the proposition that § 161.001(1)(N) "was never intended to apply to someone" in prison merely because the parent is in prison. . . . Returning the child to the parent, per § 161.001(1)(N)(i), does not necessarily mean that the child has to be physically delivered to the incarcerated individual. Not every person in prison has his or her child taken away by the State. Nor is every person in prison unable to provide the child a good environment. Indeed, it is quite conceivable that one in prison may still be able to do so by, at the very least, leaving the ward in the capable hands of a relative, friend or spouse. If such could be done, then it is conceivable that the State has the ability to relinquish its custody over the youth and, thereby, effectively return the child to the incarcerated parent. At the very least, we cannot say that incarceration renders that possibility impossible.

*In re D.S.A.*, 113 S.W.3d 567, 573–74 (Tex. App.—Amarillo 2003, no pet.) (citations omitted). Accordingly, we conclude and hold that subsection N can be applied to incarcerated parents.

6

Father also contends that the evidence is insufficient to show that the Department made reasonable efforts in this case.

The CPS investigator who took the referral when A.H. was born stated that Mother initially asked for A.H. to be placed with her brother. The investigator had information that Mother's brother might be living with Mother's mother, who had a history of drug use. The investigator therefore decided to review other possible family placements. Mother told the investigator that Father's family had CPS history and drug history, so the investigator did not look further into Father's family. She did not do any independent research. The investigator attempted to contact the paternal grandmother of Mother's oldest son[4] three times and Mother's grandmother once,[5] but she could not reach either one. The investigator sent a letter to Father in jail about the emergency removal and then turned the case over to a different investigator.

The caseworker confirmed the investigator's testimony. She had attempted to place A.H. with Mother's brother, but when she explained he could not have contact with his and Mother's mother (who had tested positive for methamphetamines) and that Mother's mother would not be allowed to help him out with A.H., he told the caseworker he wanted to think about it but did not

---

[4]A.H. is Mother's fourth child. Her oldest two children, a boy and girl, live with the boy's paternal grandmother and are not related to Father. Mother's and Father's rights to Mother's third child have been terminated, and he has been adopted.

[5]The phone number was disconnected.

follow up. The paternal uncle of Mother's oldest son, L.C., and his wife came forward as potential placements, but CPS ruled them out because they did not have a significant relationship with A.H. or Mother. The Department had also approached the adoptive parents of A.H.'s brother, but they were not interested in taking on another child. The caseworker, like the investigator, did not perform an independent investigation of Father's family.

The service plan sent to Father in November states that no family provided has been able to pass the background or CPS history checks.

This court has held that the Department's "preparation and administration of a service plan for the parent constitutes evidence that the [Department] made reasonable efforts to return the child to the parent." *In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *see M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 309–10 (Tex. App.—El Paso 2009, pet. denied). "[T]he issue is whether the Department made '*reasonable* efforts' not ideal efforts." *In re M.V.G.*, No. 10-09-00054-CV, 2010 WL 730366, at *5 (Tex. App.—Waco Mar. 3, 2010, no pet.).

Father admitted he received the service plan A.H.'s caseworker prepared, and a file-stamped copy of the service plan is included in the clerk's record. Although it is possible a more thorough attempt to contact Father's family might have uncovered other *potential* placements for further investigation, we note that Father had the opportunity to provide potential family placements to the Department and did not do so. In light of the prior termination of A.H.'s brother,

8

also Father's child, and the record as a whole, we conclude and hold that the Department proved the subsection N ground by clear and convincing evidence and, thus, that the evidence is legally and factually sufficient on that ground. *See, e.g.*, *M.V.G.*, 2010 WL 730366, at *5–6. We therefore overrule Father's primary issue.

### Mother's Appeal

In her sole issue, Mother contends that the evidence is factually insufficient to support the trial court's best interest finding because the record shows that the placement opportunity with L.C., the paternal uncle of Mother's oldest son, would have ensured "frequent and ongoing contact with his siblings."

Mother admits that the evidence at trial showed that she was a long-time methamphetamine user, used methamphetamines while pregnant with A.H., relapsed while out of jail during the pendency of this case, was not able to parent A.H. because she was in the SAFP[6] program at the time of trial and would not be able to care for A.H. even after she was released, and had her rights to one of her other children terminated. The evidence also showed that Mother's mother, with whom Mother planned to live upon her release, had also been a methamphetamine user, although Mother testified that her mother had been clean for almost a year before trial.

---

[6]SAFP is a substance-abuse felony punishment facility within the Texas Department of Criminal Justice. *Rouse v. State*, 300 S.W.3d 754, 758 n.6 (Tex. Crim. App. 2009).

9

According to Mother, "there was clear and convincing evidence that [L.C.] has frequent contact with A.H.'s siblings." In support of this proposition, Mother cites her own testimony that her older two children were living with L.C.'s mother and that L.C. frequently visits his mother. But the record also contains testimony from A.H.'s caseworker that L.C. had not seen Mother in years, that he did not have a significant relationship with Mother's family, that the Department turned down the placement for that lack of relationship with Mother and A.H., and that Mother was concerned about placing A.H. with L.C. because she was afraid she would not be able to see A.H. or have access to him. For that reason, Mother did not sign a form provided by the caseworker, which would have indicated that she wanted the Department to consider L.C. further as a potential placement.

Mother stated that she was initially concerned about A.H.'s being placed with L.C.: "My oldest son's grandmother doesn't let me see my kid as much as I want to, so I thought that maybe [L.C.] and his wife would be the same way she was, not letting me see him as much as I wanted to." She said that she did turn in "[o]ne form" to the caseworker but that she remembered

> getting some forms to fill out, and I finally did meet with [L.C.] and his wife and we sat down and talked, and they were going to turn the forms back in to [the caseworker]. They were going to get some more information and turn the forms back in to [the caseworker], but I guess they never did.

According to Mother, she had decided about five to six months before trial that she wanted A.H. placed with L.C. after meeting with him and his wife, but she did not have an opportunity to tell the caseworker because she had to turn herself in

10

for SAFP. When asked if she thought A.H. would have a good family life with L.C., Mother answered, "Yes," and when asked if there was any indication she would get to visit A.H. if he was placed with L.C., she said, "Oh, yeah."

Mother claims this case is similar to *Horvatich v. Texas Department of Protective & Regulatory Services*, 78 S.W.3d 594 (Tex. App.—Austin 2002, no pet.). In that case, the court reversed for factual insufficiency because the record was not yet fully developed as to the Department's efforts to place the child with a family member. *Id.* at 604. Most troubling to the court in that case was that "the record contain[ed] no testimony regarding how the children were doing in foster care, whether the children were being considered for adoption or the likelihood of their being adopted, or any testimony from anyone who had personal knowledge of the children at the time of trial." *Id.* at 602. The child's caseworker had not been allowed to testify. *Id.* at 601–02.

Here, however, the child's caseworker and one of his foster parents testified. Both testified that A.H. was doing well in foster care, that he had bonded with his foster parents, and that they wanted to adopt him. Thus, this case is not factually similar enough to *Horvatich* for its reasoning to be compelling.

The Department presented evidence of stable future plans for A.H. in contrast to Mother's troubled past and very recent, but still unstable, participation

11

in the SAFP program.[7]  The Department also presented evidence that A.H.'s potential adoptive family was open to his visiting his siblings if possible.  A.H.'s foster mother testified that she had reached out to his adopted brother's family to facilitate visitation, but she had not heard back from them.  She and her husband were willing to allow visitation with A.H.'s biological family, however.  Based on the record before us, we conclude and hold that the evidence is factually sufficient to support the trial court's best interest finding.  *See* Tex. Fam. Code Ann. § 263.307(b) (West 2008); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  Accordingly, we overrule Mother's sole issue.

## Conclusion

Having overruled Mother's and Father's issues, we affirm the trial court's order of termination.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:  March 21, 2013

---

[7]Mother had been in SAFP for about five to six months at the time of trial and was in a twelve-step program, but was still on the first step—admitting she was powerless over drugs.

12