02-12-444-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00444-CV

 

 


 
 
 In
 the Interest of A.H., A Child
 
 
 §
  
 §
  
 §
  
 §
  
 
 
 From the 323rd District
 Court
  
 of
 Tarrant County (323-95486J-11)
  
 March
 21, 2013
  
 Opinion
 by Chief Justice Livingston
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s order of termination.  It is ordered that the order
of termination of the trial court is affirmed.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Chief Justice Terrie Livingston

 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00444-CV

 

 


 
 
 In the Interest of A.H., A Child
 
 


 

 

----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

          In
this termination appeal, A.H.’s father, P.H. (Father), contends that the
evidence is legally and factually insufficient to support the trial court’s
findings supporting termination grounds under section 161.001(1) and 161.002 of
the family code.  A.H.’s mother, C.R. (Mother), contends that the evidence is
factually insufficient to support the trial court’s best interest finding.  We
affirm.

Father’s Appeal

          The
trial court found that Father (1) “knowingly placed or knowingly allowed the
child to remain in conditions or surroundings which endanger the physical or emotional
well-being of the child;” (2) “engaged in conduct or knowingly placed the child
with persons who engaged in conduct which endangers the physical or emotional
well-being of the child;” and (3) “constructively abandoned the child.”[2] 
See Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N) (West Supp.
2012).  We need only find the evidence sufficient on one of these grounds to
support the trial court’s termination order as to Father.  In re A.V.,
113 S.W.3d 355, 362 (Tex. 2003); In re E.M.N., 221 S.W.3d 815, 821
(Tex. App.—Fort Worth 2007, no pet.).

          To
prove the constructive abandonment ground, the Department of Family and
Protective Services had to show that Father

constructively
abandoned the child who ha[d] been in the permanent or temporary managing
conservatorship of the Department . . . for not less than six months, and:

 

(i) the [D]epartment
. . . ha[d] made reasonable efforts to return the child to [Father];

 

(ii) [Father] ha[d]
not regularly visited or maintained significant contact with the child; and

 

(iii) [Father] ha[d] demonstrated an inability to provide
the child with a safe environment[.]

See Tex.
Fam. Code Ann. § 161.001(1)(N).

          Father
and Mother were both incarcerated when A.H. was born in October 2011, which is
when the Department removed A.H. from Mother.[3]  A.H.’s caseworker
testified that she prepared a service plan for Father in November 2011 and that
she mailed it to him in jail.  At that time, the caseworker noted in a status
report to the court that visitation with Father and Mother was not possible
because of their incarceration but that the Department would attempt to arrange
visitation with A.H.’s older sibling, who had been adopted by another family.  The
caseworker also sent a letter at the same time with her contact information. 
Father never contacted her.

Father
was released from jail in February 2012.  The caseworker tried contacting him
again, but she could not find him, and he did not contact her.  Father was reincarcerated
in May 2012 after committing a different criminal offense; he had not contacted
the caseworker at all while he was out of jail.  The caseworker testified that
had Father contacted her, she would have set up a meeting with him to go over
his service plan and set up visitation with A.H.  In contrast, Father had
written to a Department investigator in October 2011 asking about the status of
the case and indicating he would seek custody of A.H. upon his release from
jail.

          A
family service plan evaluation filed with the court in August 2012 noted the
following concerns with Father “as of 7/25/2012”:

1)  
Father
had never met A.H.;

2)  
Father
was in jail;

3)  
Father
had not demonstrated that he was willing to meet A.H.’s needs;

4)  
Father
had an extensive criminal history;

5)  
The
Department had not had any contact with Father and it appeared that he was
“unwilling to work services towards family reunification”; and

6)  
Father
did not appear to be willing to put A.H.’s needs ahead of his own.

The
Department further noted that

1)  
The
caseworker had no contact with Father throughout the case;

2)  
Father
could not meet A.H.’s needs while in jail;

3)  
Father
had not contacted the caseworker to begin services nor had he begun any
services to be reunited with A.H.;

4)  
Father
had not demonstrated any parenting skills;

5)  
Father
had not provided any employment or housing information to the caseworker or Department;
and

6)  
Father
would not be released from jail until later in 2012.

          The
caseworker testified that she attempted to place A.H. with his maternal
grandmother and Mother’s brother, as well as “a fictive kin family member” of
Mother’s but that none of those placements were suitable.  A.H.’s brother had
been adopted but that family was unwilling to take A.H.  A.H. had been in foster
care since he was born.

          The
caseworker admitted on cross-examination that she probably should have visited
Father in jail, but she also believed her attempts to contact him had been
reasonable.

          Father
testified that the last time he used methamphetamine was in April 2012
while he was out of jail.  Father admitted that he had at least seven
convictions.  He also admitted committing a new theft in March 2012, for
which he was incarcerated at the time of trial.  He further admitted that he
had never seen A.H.

          Father
said he could not call anyone outside of jail but that he could send a letter. 
He also said he was in a drug program at jail and was trying to get help with
his drug problem.  He said he would probably live with his mother in Fort Worth
when he was released, which he expected to be October 22, 2012.  He
admitted getting letters from CPS while he was in jail, but he said he did not
understand what he needed to do and would have done things differently if he
had received clearer advice.  But he also said there was not any reason he
failed to contact CPS.  Father also admitted that he had received the service
plan and read it but that he did not contact anyone upon his release from jail
in February 2012 to try to regain custody of his son.  When asked why, he said
he had no answer.  He agreed that his frequent incarceration had prevented him
from parenting his children.

          Father
contends that the evidence is insufficient to support the constructive
abandonment ground because this ground does not apply to incarcerated parents;
his argument is that “the Department does not make ‘reasonable efforts to
return’ children to parents when they are in jail.”  Thus, according to Father,
incarceration of a parent precludes termination on this ground.

          While
imprisonment, standing alone, does not constitute constructive abandonment, In
re D.T., 34 S.W.3d 625, 633 (Tex. App.––Fort Worth 2000, pet. denied) (op.
on reh’g), we agree with the Amarillo Court of Appeals’s reasoning below:

[W]e disagree with the proposition that § 161.001(1)(N) “was
never intended to apply to someone” in prison merely because the parent is in
prison. . . .  Returning the child to the parent, per § 161.001(1)(N)(i),
does not necessarily mean that the child has to be physically delivered to the
incarcerated individual.  Not every person in prison has his or her child taken
away by the State.  Nor is every person in prison unable to provide the child a
good environment.  Indeed, it is quite conceivable that one in prison may still
be able to do so by, at the very least, leaving the ward in the capable hands
of a relative, friend or spouse.  If such could be done, then it is conceivable
that the State has the ability to relinquish its custody over the youth and,
thereby, effectively return the child to the incarcerated parent.  At the very
least, we cannot say that incarceration renders that possibility impossible.

In
re D.S.A., 113 S.W.3d 567, 573–74 (Tex. App.––Amarillo 2003, no
pet.) (citations omitted).  Accordingly, we conclude and hold that subsection N
can be applied to incarcerated parents.

          Father
also contends that the evidence is insufficient to show that the Department
made reasonable efforts in this case.

          The
CPS investigator who took the referral when A.H. was born stated that Mother
initially asked for A.H. to be placed with her brother.  The investigator had
information that Mother’s brother might be living with Mother’s mother, who had
a history of drug use.  The investigator therefore decided to review other
possible family placements.  Mother told the investigator that Father’s family
had CPS history and drug history, so the investigator did not look further into
Father’s family.  She did not do any independent research.  The investigator
attempted to contact the paternal grandmother of Mother’s oldest son[4]
three times and Mother’s grandmother once,[5] but she could not reach
either one.  The investigator sent a letter to Father in jail about the
emergency removal and then turned the case over to a different investigator.

          The
caseworker confirmed the investigator’s testimony.  She had attempted to place
A.H. with Mother’s brother, but when she explained he could not have contact
with his and Mother’s mother (who had tested positive for methamphetamines) and
that Mother’s mother would not be allowed to help him out with A.H., he told
the caseworker he wanted to think about it but did not follow up.  The paternal
uncle of Mother’s oldest son, L.C., and his wife came forward as potential
placements, but CPS ruled them out because they did not have a significant
relationship with A.H. or Mother.  The Department had also approached the
adoptive parents of A.H.’s brother, but they were not interested in taking on
another child.  The caseworker, like the investigator, did not perform an
independent investigation of Father’s family.

          The
service plan sent to Father in November states that no family provided has been
able to pass the background or CPS history checks.

          This
court has held that the Department’s “preparation and administration of a
service plan for the parent constitutes evidence that the [Department] made
reasonable efforts to return the child to the parent.”  In re M.R.J.M., 280
S.W.3d 494, 505 (Tex. App.––Fort Worth 2009, no pet.) (op. on reh’g); see
M.C. v. Tex. Dep’t of Family & Protective Servs., 300 S.W.3d 305, 309–10
(Tex. App.––El Paso 2009, pet. denied).  “[T]he issue is whether the Department
made ‘reasonable efforts’ not ideal efforts.”  In re M.V.G., No.
10-09-00054-CV, 2010 WL 730366, at *5 (Tex. App.––Waco Mar. 3, 2010, no pet.).

          Father
admitted he received the service plan A.H.’s caseworker prepared, and a
file-stamped copy of the service plan is included in the clerk’s record. 
Although it is possible a more thorough attempt to contact Father’s family
might have uncovered other potential placements for further
investigation, we note that Father had the opportunity to provide potential
family placements to the Department and did not do so.  In light of the prior
termination of A.H.’s brother, also Father’s child, and the record as a whole,
we conclude and hold that the Department proved the subsection N ground by
clear and convincing evidence and, thus, that the evidence is legally and
factually sufficient on that ground.  See, e.g., M.V.G., 2010 WL
730366, at *5–6.  We therefore overrule Father’s primary issue.

Mother’s
Appeal

          In
her sole issue, Mother contends that the evidence is factually insufficient to
support the trial court’s best interest finding because the record shows that
the placement opportunity with L.C., the paternal uncle of Mother’s oldest son,
would have ensured “frequent and ongoing contact with his siblings.”

          Mother
admits that the evidence at trial showed that she was a long-time
methamphetamine user, used methamphetamines while pregnant with A.H., relapsed
while out of jail during the pendency of this case, was not able to parent A.H.
because she was in the SAFP[6] program at the time of
trial and would not be able to care for A.H. even after she was released, and had
her rights to one of her other children terminated.  The evidence also showed
that Mother’s mother, with whom Mother planned to live upon her release, had
also been a methamphetamine user, although Mother testified that her mother had
been clean for almost a year before trial.

          According
to Mother, “there was clear and convincing evidence that [L.C.] has frequent
contact with A.H.’s siblings.”  In support of this proposition, Mother cites her
own testimony that her older two children were living with L.C.’s mother and
that L.C. frequently visits his mother.  But the record also contains testimony
from A.H.’s caseworker that L.C. had not seen Mother in years, that he did not
have a significant relationship with Mother’s family, that the Department
turned down the placement for that lack of relationship with Mother and A.H.,
and that Mother was concerned about placing A.H. with L.C. because she was
afraid she would not be able to see A.H. or have access to him.  For that
reason, Mother did not sign a form provided by the caseworker, which would have
indicated that she wanted the Department to consider L.C. further as a
potential placement.

          Mother
stated that she was initially concerned about A.H.’s being placed with L.C.:  “My
oldest son’s grandmother doesn’t let me see my kid as much as I want to, so I thought
that maybe [L.C.] and his wife would be the same way she was, not letting me
see him as much as I wanted to.”  She said that she did turn in “[o]ne form” to
the caseworker but that she remembered

getting some forms to fill out, and I finally did meet
with [L.C.] and his wife and we sat down and talked, and they were going to
turn the forms back in to [the caseworker]. They were going to get some more
information and turn the forms back in to [the caseworker], but I guess they
never did.

According
to Mother, she had decided about five to six months before trial that she
wanted A.H. placed with L.C. after meeting with him and his wife, but she did
not have an opportunity to tell the caseworker because she had to turn herself
in for SAFP.  When asked if she thought A.H. would have a good family life with
L.C., Mother answered, “Yes,” and when asked if there was any indication she
would get to visit A.H. if he was placed with L.C., she said, “Oh, yeah.”

          Mother
claims this case is similar to Horvatich v. Texas Department of Protective
& Regulatory Services, 78 S.W.3d 594 (Tex. App.––Austin 2002, no pet.). 
In that case, the court reversed for factual insufficiency because the record
was not yet fully developed as to the Department’s efforts to place the child
with a family member.  Id. at 604.  Most troubling to the court in that
case was that “the record contain[ed] no testimony regarding how the children
were doing in foster care, whether the children were being considered for
adoption or the likelihood of their being adopted, or any testimony from anyone
who had personal knowledge of the children at the time of trial.”  Id.
at 602.  The child’s caseworker had not been allowed to testify.  Id. at
601–02.

          Here,
however, the child’s caseworker and one of his foster parents testified.  Both
testified that A.H. was doing well in foster care, that he had bonded with his
foster parents, and that they wanted to adopt him.  Thus, this case is not
factually similar enough to Horvatich for its reasoning to be
compelling.

The
Department presented evidence of stable future plans for A.H. in contrast to
Mother’s troubled past and very recent, but still unstable, participation in
the SAFP program.[7]  The Department also
presented evidence that A.H.’s potential adoptive family was open to his
visiting his siblings if possible.  A.H.’s foster mother testified that she had
reached out to his adopted brother’s family to facilitate visitation, but she
had not heard back from them.  She and her husband were willing to allow
visitation with A.H.’s biological family, however.  Based on the record before
us, we conclude and hold that the evidence is factually sufficient to support
the trial court’s best interest finding.  See Tex. Fam. Code Ann.
§ 263.307(b) (West 2008); Holley v. Adams, 544 S.W.2d 367, 371–72
(Tex. 1976).  Accordingly, we overrule Mother’s sole issue.

Conclusion

Having
overruled Mother’s and Father’s issues, we affirm the trial court’s order of
termination.

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; DAUPHINOT and GARDNER, JJ.

 

DELIVERED:  March 21, 2013









[1]See Tex. R. App. P. 47.4.





[2]Based on the trial court’s
specific findings in the termination order, we cannot discern Father’s
following argument:  “In this case, the trial court found by clear and
convincing evidence that [P.H.] violated Section 161.001(1)(D), (E), and (N). 
It did not[,] however, find that P.H. committed any act enumerated in
161.001(1).”  A finding that a parent has violated these specific sections is a
finding that the parent committed acts enumerated in section 161.001(1).  We
therefore overrule Father’s alternative issue.





[3]A.H. was removed from the
hospital where Mother delivered him.





[4]A.H. is Mother’s fourth
child.  Her oldest two children, a boy and girl, live with the boy’s paternal
grandmother and are not related to Father.  Mother’s and Father’s rights to
Mother’s third child have been terminated, and he has been adopted.





[5]The phone number was
disconnected.





[6]SAFP is a substance-abuse
felony punishment facility within the Texas Department of Criminal Justice.  Rouse
v. State, 300 S.W.3d 754, 758 n.6 (Tex. Crim. App. 2009).





[7]Mother had been in SAFP
for about five to six months at the time of trial and was in a twelve-step
program, but was still on the first step––admitting she was powerless over
drugs.