NO. 07-03-0084-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

AUGUST 6, 2003
_____

IN RE D.S.A., E.E.A. AND O.J.A.,

Minors
_____

FROM THE 242nd DISTRICT COURT OF HALE COUNTY;

NO. B31873-0111; HON. ED SELF, PRESIDING
_____

**OPINION**
_____

Before QUINN and REAVIS, JJ., and BOYD, S.J.[1]

Robert Arredondo (Arredondo) appeals from an order terminating the parental relationship between him and his three minor daughters, D.S.A., E.E.A., and O.J.A. Two issues are presented, each of which involve the sufficiency of the evidence underlying the judgment. We affirm that judgment.

*Issue One - Legal and Factual Sufficiency of Statutory Grounds*

In his first two issues, Arredondo challenges the legal and factual sufficiency of the evidence to support the statutory grounds of termination under §161.001(1) of the Family Code. We overrule the issues.

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2003).

*Standard of Review*

The applicable standards of review are explained in *In re J.F.C.,* 96 S.W.3d 256 (Tex. 2002) and *In re C.H.,* 89 S.W.3d 17 (Tex. 2002). Through them, and when addressing a factual sufficiency complaint, we are told to determine whether, after assessing the entire record, the evidence permits a factfinder to reasonably form a firm belief or conviction about the truth of the State's allegations. *In re J.F.C.,* 96 S.W.3d at 266; *In re C.H.,* 89 S.W.3d at 25. Unlike the situation wherein the legal sufficiency of the evidence is in question, our focus is not simply upon the undisputed evidence that supports the verdict, but the disputed evidence as well. *In re J.F.C.*, 96 S.W.3d at 266. Implicit in the standard is our obligation to accord the factfinder the deference needed for it to fulfill its role. *In re C.H.,* 89 S.W.3d at 25-26. Furthermore, if the evidence is factually sufficient, then, it is also legally sufficient. This is so because, logically, there cannot be "no evidence" of record if the record contains enough evidence to enable the factfinder to reasonably form a firm belief or conviction as to the existence of pivotal facts.

*Application of the Standard*

Multiple statutory grounds warranting termination of the parent/child relationship were submitted to the jury. Thereafter, the jury returned a general verdict and found that Arredondo's parental rights should be terminated. Because the verdict was general, the particular statutory ground allegedly warranting termination went unspecified. However, we need not determine whether each ground enjoys the requisite amount of evidentiary support. Instead, the decision may be affirmed if the evidence supports the existence of

2

one ground, *In re S.F.,* 32 S.W.3d 318, 320 (Tex. App.--San Antonio 2000, no pet.), assuming the State also proved that termination was in the best interest of the child. *See* TEX. FAM. CODE ANN. §161.001(1) & (2) (Vernon 2002) (stating that termination may be ordered if the trial court finds, by clear and convincing evidence, the existence of a statutory ground and that termination is in the best interest of the child).

Next, among the grounds asserted by the State and presented to the jury is one that permits termination if the parent has constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services or an authorized agency for not less than six months and:

(i) the department or authorized agency has made reasonable efforts to return the child to the parent;

(ii) the parent has not regularly visited or maintained significant contact with the child; and

(iii) the parent has demonstrated an inability to provide the child with a safe environment . . . .

TEX. FAM. CODE ANN. §161.001(1)(N) (Vernon 2002). To determine whether the jury could legitimately conclude that termination was warranted under this provision, we turn to the record before us.

The children were three females aged four, two, and one on November 26, 2001; the latter date was the day on which the Department of Protective and Regulatory Services (CPS) took custody of them. At the time, they were under the care of their maternal great-grandmother because both parents were incarcerated.[2] The great-grandmother was

---

[2]The mother voluntarily relinquished her parental rights, and the youngest child was born in the penitentiary.

3

observed to be confused and unable to state the children's names, the name of their mother, or the day of the week. She also did not know the name of the children's doctor, when they had last seen one, what time the children ate supper, what time they went to bed, or when they took baths. Furthermore, the caretaker had to ask the two-year-old child for answers to the questions posed by the case worker, and it was noted that the four-year-old child did the cooking and cleaning while the two-year-old child took care of the one-year-old child.

Upon removal from the household, the children were initially separated and placed in foster homes. They were reunited several months later in the home of Brenda McCullough (and her husband), a cousin of the children's mother. The latter recommended that they be placed in the care of Brenda. At the time of their placement with the McCulloughs, one of the children had ongoing urinary tract infections which were later corrected with surgery. Another child had been born with part of her arm missing. She is in the process of receiving a prosthesis, something that she did not receive before placement with the McCulloughs.

Next, case worker Cynthia Johnson (Johnson) initially spoke to Arredondo in prison on December 6, 2001.[3] At that time, he gave her the name and phone number of his mother. Johnson left several messages at that number but the calls were never returned. Subsequently, Arredondo was released to a halfway house on January 17, 2002.[4] Within several days of his release, Johnson spoke with him about a plan of service and visitation

---

[3]Arredondo was in the Substance Abuse Felony Punishment Facility (SAFP).

[4]Arredondo's original conviction was for injury to a child. The child who was assaulted by Arredondo was 14 years old but there was evidence he looked older. There was also evidence that Arredondo was intoxicated at the time of the assault.

4

with his children. She twice arranged meetings with him to sign the plan of service but he failed to attend, and she was unsuccessful in later attempts to contact him at the halfway house. The next time Johnson spoke to Arredondo was on February 6 at a status hearing for which appellant arrived two hours late.[5] Johnson went over the service plan at that time but Arredondo "was really agitated" about it because he had classes and group meetings to attend with respect to his probation. Subsequently, Johnson arranged a meeting between Arredondo, his probation officer, and herself to discuss the plan of service and determine how Arredondo could fulfill his requirements. Arredondo told her he "was not going to jeopardize going back to jail by attending . . . CPS classes." He did not attend any of the appointments or classes she arranged for him with respect to his plan of service, and did not complete any of the items on the plan of service.[6] He also did not exercise any visitation rights or provide any support for his children while he was out of prison.[7]

Arredondo's probation was revoked on April 30 for drinking alcohol, failing to abide by the terms of his curfew, failing to report his arrest for driving with a suspended license, failing to pay as ordered, and failing to attend his after care group. He was sentenced to seven years imprisonment. Johnson met with Arredondo in jail in May and discussed with him voluntary termination of his parental rights. She testified that he was amenable to that solution. In July, she wrote him about the progress of his children, and he responded the

---

[5]Arredondo claimed he did not receive timely notice of the hearing and had to walk 22 miles to get there.

[6]Under the plan of service, Arrendondo was to pay child support, maintain consistent visitation with the children, complete a psychological evaluation, find appropriate housing, obtain support through Alcoholics Anonymous and Narcotics Anonymous, obtain a drug and alcohol assessment, attend parenting classes, participate in FAME training, and attend individual/family counseling sessions.

[7]Arredondo claims he was working while he was out of prison but his probation officer was unable to verify his employment because he was allegedly paid in cash.

following month. At that point, he had changed his mind and wrote several letters indicating he wanted to be a presence in his children's lives. The plan of service was modified in October 2002 to account for his being unable to participate in some of the classes, services, and visitation rights provided for in the first plan due to his incarceration. Johnson had no proof that appellant had completed any of the requirements of the new service plan but could not say he had not done so.

Claudia Webb, a Court Appointed Special Advocate for the children, met with Arredondo on April 15, 2002. At that time, Arredondo told her he thought the children would be fine with the McCulloughs "forever." She met with him again on May 31 when she questioned him as to whether he understood why the arm of one of the children was undeveloped so that studies could be done to obtain a prosthesis.[8] He became very agitated, jumped up, charged towards her, and walked out slamming the door.

Arredondo testified that he had never formally married the children's mother. They had lived together intermittently at her great-grandmother's house. He claimed to have worked at various jobs and that he provided for his children. However, the only time the children did not live at their great-grandmother's house was for a few months after the first child was born. The children had never lived with Arredondo alone, and the last time he saw them was December 8, 2000.

Arredondo has lived at different times with his mother, his brother, his grandmother, and with the children's great-grandmother. He did not have medical insurance for the children but thought they were covered by Medicaid at one time. He claimed to have

---

[8] There was some evidence it may have been the result of drug abuse by the child's mother during pregnancy.

bought his children clothes and to have contributed to the purchase of food in the great-grandmother's household when he was not in prison. However, he admitted the child's mother was on food stamps, and Brenda also testified that Arredondo lived with the great-grandmother without payment of any kind. Arredondo testified he did not know that the great-grandmother was losing her mental abilities.

Arredondo was arrested on the charge of injury to a child in June 2000. He stayed in jail for two or three months and was released on probation. On December 8, 2000, he was arrested for violating his probation and was in jail until March 20, 2001, when he transferred to a prison unit for SAFP. He was released again in January 2002 to the halfway house and re-arrested in April for violating his probation. He stated he would be eligible for parole in about six months. He testified he has been attending Alcoholics Anonymous and Narcotics Anonymous in prison, but his parenting classes had not begun yet. He denied ever stating that he would give up his parental rights.

Arredondo's mother testified that he told her that a relative was going to take the children. However, she took no steps to find out where the children were. She also knew after December 6, 2001, that CPS was involved but did not contact that agency.

Thus, there was ample evidence from which the jury could form a firm conviction or belief that Arredondo abandoned his offspring and failed to adequately support or care for them prior to incarceration, and that after his release from SAFP, he failed to take any steps to regain custody of them, visit them, or support them. Furthermore, he voluntarily committed acts which caused his probation to be revoked, thereby resulting in his re-incarceration. Although Arredondo professed a desire to be a part of his children's lives and may be currently attending substance abuse counseling, the jury could reasonably

7

believe that appellant's actions when he was not subject to a restricted regimen within the confines of prison walls spoke more convincingly of his abandonment of his children. *See In re B.T.,* 954 S.W.2d 44, 49-50 (Tex. App.--San Antonio 1997, writ denied) (holding there was enough evidence to find the defendant abandoned his child when he claimed to have knowledge of CPS's involvement, he admitted that for periods of two years and six months he did not attempt any contact with his child, and from the date he canceled a home study until the petition was filed, he did not attempt to contact the child or CPS or provide support even when he was out of jail); *Edwards v. Dept. of Protective & Regulatory Services,* 946 S.W.2d 130, 137 (Tex. App.--El Paso 1997, no writ) (holding the evidence was legally and factually sufficient to support a finding of abandonment when the defendant knew his child was in the hospital but never visited or arranged for anyone to claim the child, never voluntarily sought out his children despite the opportunity to do so, and the case worker had to search for him).

There was also ample evidence from which a jury could form a firm belief that reasonable efforts had been made to return the children to Arredondo but he did not regularly visit them or maintain contact with them. Evidence of similar force also exists illustrating that he made only minimal efforts to meet the requirements of his service plan after he had been re-incarcerated. *See In re P. R.,* 994 S.W.2d 411, 416 (Tex. App.--Fort Worth 1999, pet. dism'd w.o.j.) (holding the evidence sufficient to support a finding under subsection (N) when the defendant routinely missed her counseling sessions, had at least ten different jobs lasting only a short period of time, had lived at 13 to 17 different places, attended only two anger management classes, attended no parenting classes, and only visited her child sporadically which resulted in a lack of bonding between them); *In re*

8

*B.S.T.,* 977 S.W.2d 481, 486 (Tex. App.--Houston [14th Dist.] 1998, no pet.), *overruled in part on other grounds by In re C.H.,* 89 S.W.3d 17 (Tex. 2000) (holding the evidence was sufficient to support termination under subsection (N) when, after release from prison, the defendant was advised of visitation but only visited with his children twice and made no further efforts to be involved with them, and a case worker testified that all reasonable efforts were made to return the children to the parents).

Additionally, evidence of record also exists illustrating that Arredondo was unable or failed to provide a safe environment because of his vague and unstable employment history, lack of a permanent residence when out of prison, failure to obtain proper medical assistance for one child's urinary tract infections and a prosthesis for another child, recurrent alcohol abuse, and failure to abide by the conditions necessary to stay out of prison. *In re P.R.,* 994 S.W.2d at 416 (holding there was a showing of an inability to provide a safe environment because of living at 13 to 17 different places in the last year, an unstable employment history, failure to obtain immunizations for the child, and use of methamphetamines and marijuana the day before a court-ordered psychologist evaluation). In summary, and without viewing the evidence in a light favoring the verdict, we conclude that the disputed and undisputed evidence both favoring and disfavoring the verdict permitted a reasonable factfinder to form a firm conviction and belief that the requirements of subsection (N) were met. In other words, the verdict is supported by factually sufficient evidence, and because it is, it is also supported by legally sufficient evidence.

Arredondo argues that according to *In re A.V.,* 57 S.W.3d 51 (Tex. App.--Waco 2001, pet. granted)*, rev'd on other grounds,* No. 01-0706, 2003 LEXIS 111 (TEX. JULY 3,

9

2000), §161.001(1)(N) is inapplicable when the parent is in prison. This is allegedly so because when a parent is in prison, the State cannot show that it has made reasonable effort to return the child to the parent (*i.e.* relinquish its custody to the parent), or that the parent has not regularly visited or maintained sufficient contact with the child or the parent has not demonstrated an inability to provide the child with a safe environment. While it may be that both the court and the State so suggested in *A.V.*, we disagree with the proposition that §161.001(1)(N) "was never intended to apply to someone" in prison merely because the parent is in prison. *Id.* at 62. Simply put, both the State and the court in *A.V.* read §161.001(1)(N) too literally. Returning the child to the parent, per §161.001(1)(N)(i), does not necessarily mean that the child has to be physically delivered to the incarcerated individual. Not every person in prison has his or her child taken away by the State. Nor is every person in prison unable to provide the child a good environment. Indeed, it is quite conceivable that one in prison may still be able to do so by, at the very least, leaving the ward in the capable hands of a relative, friend or spouse. *See In re R.L.T.,* No. 07-02-0332-CV, slip op. at 3-4, 2003 LEXIS 5289 (Tex. App.--Amarillo June 24, 2003) (wherein the parent presented evidence that he could leave the child with a relative). If such could be done, then it is conceivable that the State has the ability to relinquish its custody over the youth and, thereby, effectively return the child to the incarcerated parent. At the very least, we cannot say that incarceration renders that possibility impossible. And, it is simply a "cop-out" (in the vernacular of the 70's) for anyone to conclude that prison *ipso facto* prevents (or relieves) the parent from providing the child a safe environment. Again, the incarcerated parent may be able to work through surrogates, such as relatives, spouses, or friends, to fulfill that obligation. And, if he so arranges and those surrogates agree to

10

the arrangement, it is hard to deny that the parent has taken steps to provide or effectively provided a safe environment. To suggest otherwise would be to suggest that military personnel cannot provide for their children because they may be assigned overseas to combat duty. In that situation, family is often available to step in and help. The same can be no less true when a parent is incarcerated. Nor can we say that incarceration renders it impossible for the parent to maintain significant contact with the child. While the child may not be able to live with the parent in a jail cell, it would seem that the parent could nonetheless pursue a significant relationship with the offspring through, at the very least, written correspondence. In sum, incarceration does not render sub-paragraph (N) inapplicable simply because of incarceration. And, to the extent that the State and court in *A.V.* and Arredondo suggest otherwise, we believe them to be wrong.

### *Issue Two - Best Interest of the Children*

In his second issue, Arredondo contests the legal and factual sufficiency of the evidence to support a finding that it was in the best interest of the children to end his parental rights. We overrule the issue and conclude that the verdict enjoys the support of both legally and factually sufficient evidence.

To help determine whether that jury finding has sufficient evidentiary support, we turn to the record and consider what have become known as the *Holley* factors. These factors, which have been mentioned by the Texas Supreme Court as insightful on the issue, consist of: 1) the desires of the child; 2) the emotional and physical needs of the child now and in the future; 3) the emotional and physical danger to the child now and in the future; 4) the parental abilities of the individuals seeking custody; 5) the programs available to assist these individuals to promote the best interests of the child; 6) the plans

11

for the child by these individuals or by the agency seeking custody; 7) the stability of the home or proposed placement; 8) the acts or omission of the parent which may indicate that the existing parent/child relationship is not a proper one; and 9) any excuse for the acts or omission of the parent. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976). However, we must remember these are not the exclusive indicia which may be considered. *In re C.H.,* 89 S.W.3d at 27. For instance, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *Id.* at 28. Moreover, one need not prove that each *Holley* factor favors termination. *Id.* All one need do is present enough evidence from which the factfinder can reasonably form a firm conviction or belief that the child's best interest warrants termination.

Here, we have evidence that Arredondo 1) has an unstable employment history and residency status, 2) was convicted of injury to a child, 3) violated the terms of his probation on multiple occasions which eventually resulted in his incarceration, 4) has a substance abuse problem, 5) failed to visit or support his children at a time when he was free to do so and allegedly employed, and 6) failed to meet the requirements of his family service plan. There is also evidence that the McCulloughs 1) want to adopt the children, 2) have provided a stable and loving environment, 3) have attended to the medical needs of the children which needs went unattended prior to their placement with the McCulloughs, and 4) have attended counseling with the children, sought individual counseling for the children, and obtained all the counseling that has been suggested to them. The children have also expressed a fear they will be taken from the home of the McCulloughs. From these facts, one can reasonably deduce that Arredondo lacked the ability, skills or desire to care for his

12

offspring, that he failed to take advantage of programs to assist him in improving his personal and parenting skills, that the children needed a stable home environment which Arredondo could or would not provide, and that his acts or omissions indicated the lack of a proper parent/child relationship. In short, and without looking at the evidence in a light most favorable to the verdict, we conclude that both the disputed and undisputed evidence favoring and disfavoring the verdict permits a reasonable factfinder to form a firm conviction and belief that termination of the parent/child relationship was in the best interests of the children.

Having found the evidence legally and factually sufficient to warrant termination and that it would be in the best interest of the children to terminate the parent/child relationship, we affirm the judgment of the trial court.


Brian Quinn
Justice