In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-19-00167-CV
_____

IN THE INTEREST OF A.H.

On Appeal from the 410th District Court
Montgomery County, Texas
Trial Cause No. 18-05-06835-CV

**MEMORANDUM OPINION**

After a bench trial, Appellant Father appeals from a judgment terminating his parental rights to his eight-year-old daughter, A.H.[1] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(F), (N), (O), (2) (West Supp. 2018). Father was represented by counsel at the termination proceeding but Father did not testify. In three issues, Father challenges the legal sufficiency of the evidence supporting the trial court's

---

[1] To protect the identity of the minor, we use initials to refer to the child and a pseudonym for her mother. *See* Tex. R. App. P. 9.8(b)(2).

1

termination of his parental rights under Family Code sections 161.001(b)(1)(F), (N), and (O).[2] We affirm the trial court's judgment.

Background

CPS Investigator Tara Bauch testified that she investigated allegations of "neglectful supervision due to the fact that the mother was found deceased in the hotel room with [A.H.]" In her Affidavit in Support of Removal admitted into

___

[2] Subsections 161.001(b)(1)(F), (N), and (O) provide that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has
> (F) failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition; . . .
> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
>> (i)  the department has made reasonable efforts to return the child to the parent;
>> (ii)  the parent has not regularly visited or maintained significant contact with the child; and
>> (iii)  the parent has demonstrated an inability to provide the child with a safe environment; [or]
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

*See* Tex. Fam. Code Ann. § 161.001(b)(1)(F), (N), and (O) (West Supp. 2018).

evidence, Bauch stated that upon her arrival to the hotel on May 25, 2018, EMS was administering CPR on A.H.'s mother. A police officer told Bauch that EMS suspected A.H.'s cause of death to be alcohol poisoning or a heart attack. According to Bauch, she spoke with A.H. and learned that she and her mother had traveled from Oklahoma to visit A.H.'s brother for his high school graduation. A.H. informed Bauch that her grandparents died and she last saw her father two years ago when he choked her mother. A.H.'s brother told Bauch that he was unaware of any living relatives on his mother's side of the family. Bauch spoke to one of A.H.'s mother's friends who provided Father's name, and the friend stated that Father was abusive towards A.H.'s mother and was likely in jail. Bauch concluded that it was in A.H.'s interest for the Department of Family and Protective Services ("the Department") to be named A.H.'s Temporary Managing Conservator as the Department had made reasonable efforts to prevent or alleviate the need for A.H.'s removal, A.H.'s father had not been found, her mother was deceased, and there was no information regarding relatives to contact. Bauch testified that on the day of removal, A.H. was placed in the same home as her older brother, with whom she was comfortable and had previously lived. According to Bauch, A.H. was still placed in the same home at the time of trial.

3

Bauch testified that, on the Tuesday after A.H. was removed, Bauch met Father, A.H.'s paternal grandmother (R.B.), and A.H.'s paternal great grandmother, who lived in Oklahoma and wanted to take A.H. home with them. Bauch testified that she did not initially set up visitation with A.H. and Father because "the child did not want to visit because the last time she saw [Father] he was choking her mom." When asked whether any police reports or other documentation corroborated the alleged choking incident, Bauch responded that although there was no criminal history or documentation of the incident, "[t]he family has multiple CPS cases out of the State of Oklahoma, and domestic violence is a part of one of those and drug use."

CPS Supervisor Latasha Hickman testified that she was assigned to the case "[s]ince the beginning[]" and that Father's service plan ordered Father to participate in "[s]ubstance abuse assessment, individual counseling, psychological, parenting, [and to] maintain contact with the Department." According to Hickman, the Department made attempts to contact Father, but Father did not contact the Department at any time for visitation. She explained that when the Department would attempt to contact Father, Father's mother would stop the phone calls, and the Department had not had any contact with Father in the past year. Hickman clarified that visits for A.H. and Father required a recommendation from the therapist.

4

According to Hickman, the Department talked to the therapist about contact, but the therapist did not recommend any contact because "[t]he child doesn't want any contact with her father." Hickman testified that Father did not visit A.H. at all or provide financial support to the Department for her care during the pendency of the case. Hickman further testified that Father did not demonstrate the ability to provide a safe and stable environment for A.H. and Father did not participate in any of the court-ordered services. Hickman testified that if a parent lives out-of-state, services are provided for the parent in Texas, but if the parent does not come to Texas for services then the parent bears the cost of services.

Hickman had no knowledge whether an acknowledgement of Father's paternity had been located, and she did not know whether A.H. lived with Father for at least two years after her birth. According to Hickman, A.H. had not asked to see her Father during the case, and to Hickman's knowledge, A.H. did not have a relationship with her Father and had not seen him for "three or four years [][,] [p]ossibly more." Hickman testified that to her knowledge, the caseworker mailed Father a copy of the service plan, Father was aware of where A.H. was placed, and Father never asked that A.H. be placed with him. According to Hickman, Father did not contact anyone at CPS about how to set up his services.

5

Hickman testified that she visited A.H. in her current placement on one occasion and that A.H. is doing well in the home with her half-brother. Hickman explained that she believed termination of Father's parental rights is in A.H.'s best interests because Father has "failed to show that he has any interest in the well[-]being and safety of [A.H.,] has not made any contact or efforts to contact the Department[, and] has not show[n] any interest in [A.H.]"

The court-appointed special advocate (CASA) testified that she has visited with A.H. monthly since being assigned to the case in June of 2017. According to the CASA, when she first visited A.H., the child's emotional state was fragile. The CASA testified that there were no visitations between A.H. and Father or any of the grandparents during the pendency of the case. The CASA testified she had no contact with Father and tried once to call the contact number for him but "the phone number just, it rang . . . didn't receive voice mail message or anything[.]" According to the CASA, Father was present in court on June 6th and available by phone at the July 23rd status hearing. The CASA testified that Father and A.H.'s paternal grandmother did not attend the permanency conference although the CASA believed they received notice of the hearing. The CASA testified that Father's services were court-ordered at the July 23rd status hearing that Father attended by phone and that Father never filed anything to ask the court to amend his services or to ask for visitation.

The CASA testified that, for as long as she has been assigned to the case, A.H. has not mentioned her paternal grandmother, and the paternal grandmother has not visited with A.H. The CASA testified that she provided Father her contact information on the day she was assigned the case and he has never contacted her.

The CASA testified that A.H. was placed with her half-brother's family. According to the CASA, A.H.'s mother was also the half-brother's mother. The CASA testified that A.H. appeared to have a close relationship with her half-brother. According to the CASA, A.H. has been doing "really well" in her current placement over the last year, and the CASA's recommendation is for adoption of A.H. by the half-brother's family. The CASA testified that A.H. has not asked to see Father, she has no relationship with her Father, and the last time she saw Father was "three or four years ago[,] [p]ossibly more." The CASA testified that she believed that termination of Father's parental rights is in A.H.'s best interest. The CASA indicated that Father has not met the court's requirements to get access to A.H. According to the CASA,"[A.H.] does not want to see him. She has a very traumatic memory of [Father]. . . . So, she prefers not to see him because of that." The CASA testified that at each visit with A.H., she asked A.H. if she wanted to see her paternal grandmother and she stated she did not. The CASA testified that she hopes that A.H. is adopted

by her current placement family because A.H. is "very happy[]" there and is "adjusting very well."

The trial court found clear and convincing evidence of prohibited predicate acts under Texas Family Code sections 161.001(b)(1)(F), (N), and (O), and the trial court found that termination was in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(F), (N), (O), (2). The trial court terminated Father's parental rights, and Father appealed.

## Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence, that is, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2019); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *see also In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief

or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interests. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (applying previous version of the statute).

### Predicate Finding under Section 161.001(b)(1)(N)

In Father's second issue, he contends that the evidence was legally insufficient to support terminating his parental rights under Family Code subsection 161.001(b)(1)(N). Subsection N provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has

> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
> (i)  the department has made reasonable efforts to return the child to the parent;
> (ii)  the parent has not regularly visited or maintained significant contact with the child; and
> (iii)  the parent has demonstrated an inability to provide the child with a safe environment[.]

9

Tex. Fam. Code Ann. § 161.001(b)(1)(N). The first element, the Department's reasonable efforts to return the child to the parent, "'focuses on [the Department's] conduct; the second and third elements focus on the parent's conduct.'" *In re A.K.L.*, No. 01-16-00489-CV, 2016 Tex. App. LEXIS 13027, at *19 (Tex. App.—Houston [1st Dist.] Dec. 8, 2016, pet. denied) (mem. op.) (quoting *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.)). The evidence must be sufficient to support each element set out in subsection N, and the Department bears the burden of proof. *See In re A.L.H.*, 468 S.W.3d at 744 (citing *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied); *In re A.S.*, 261 S.W.3d 76, 90 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)).

Father does not dispute that the Department had permanent or temporary managing conservatorship of A.H. for not less than six months. However, Father specifically argues that no evidence supports the trial court's findings that the Department made reasonable efforts to return A.H. to Father, that Father had not regularly visited or maintained significant contact with A.H., and that Father had demonstrated an inability to provide the child with a safe environment.

As to the first element of subsection N, implementation of a family service plan is ordinarily considered a reasonable effort by the Department to return a child to his or her parent. *In re N.K.T.*, No. 01-16-00439-CV, 2016 Tex. App. LEXIS

10

11638, at *20 (Tex. App.—Houston [1st Dist.] Oct. 27, 2016, no pet.) (mem. op.); *In re N.R.T.*, 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.). Father argues that although the creation of a service plan ordinarily constitutes a reasonable effort by the Department to return the child to a parent, "the record does not contain any testimony from a Department representative that Appellant was provided any direction or reasonable opportunity to complete the service plan" and "zero testimony was provided as to what services on the service plan[] were available to Appellant near his home in Oklahoma." In support of this argument, Father cites to *In re A.Q.W.*, 395 S.W.3d 285, 288 (Tex. App.—San Antonio 2013, no pet.).

In assessing the Department's efforts, ideal efforts need not be shown—only reasonable efforts. *In re N.K.T.*, 2016 Tex. App. LEXIS 11638, at **20-21; *In re S.R.*, No. 12-14-00238-CV, 2015 Tex. App. LEXIS 642, at *7 (Tex. App.—Tyler Jan. 23, 2015, pet. denied) (mem. op.); *see also In re M.V.G.*, 440 S.W.3d 54, 61 (Tex. App.—Waco 2010, no pet.) (recognizing, in conducting sufficiency analysis of reasonable-efforts requirement, that "there probably are things the Department could have done differently [when implementing mother's service plan], but the issue is whether the Department made '*reasonable* efforts'").

Here, CPS Supervisor Hickman testified about Father's court-ordered service plan. Hickman testified that the plan was mailed to the address Father provided to

the Department, that the Department attempted to contact him, and that he never contacted the Department. According to Hickman, Father could have participated in services in Texas at no cost or in Oklahoma at his own cost, but that he did not contact anyone at CPS to find out about how to set up his services, he did not participate in any court-ordered services, and he did not show any interest in A.H.'s well-being or safety. The CASA testified that Father was present for one court date and was available by phone at a later status hearing when his services were court-ordered, she gave her contact information to Father, and she made an attempt to contact Father but it was unsuccessful. The CASA also testified that although Father had the CASA's contact information, he had never contacted her.

Father's reliance on *In re A.Q.W.* is misplaced because that case is factually distinguishable. In that case, the San Antonio Court of Appeals stated the following:

> [A]ppellant was not confirmed as A.Q.W.'s father until approximately thirty-six days before the termination hearing, and he did not receive his service plan until thirty-four days before the hearing. During this time he was incarcerated. The record contains no evidence that appellant was provided with a reasonable opportunity to enroll in, much less complete, any of the requirements that he could have complied with while incarcerated. On this scant record, we must conclude the evidence is legally insufficient to support a finding that the Department made a reasonable effort to return A.Q.W. to his father.

*In re A.Q.W.*, 395 S.W.3d at 290. In the present case, Father did not argue to the trial court and does not assert on appeal that he only learned of paternity shortly before

the termination hearing or that he was incarcerated during the pendency of the case. Here, there was ample evidence for the trial court to have formed a firm belief or conviction that reasonable efforts had been made by the Department to return A.H. to Father. *See In re J.O.A.*, 283 S.W.3d at 344-45.

As to the second element of subsection N, Father argues that the court-ordered suspension of his visits with A.H. prevented him from exercising any right to visitation and that "there is no testimony or evidence that the Appellant was offered a single visit with his child, or that he declined it." Although the Department acknowledged that he was prevented from seeing A.H. until the therapist recommended the visits, there is no evidence in the record that Father attempted to initiate or maintain contact with A.H. in other ways, such as through letters, cards, or small gifts, nor is there any evidence that Father made any inquiries or requests to the Department or to the therapist regarding visitation. CPS Supervisor Hickman testified that Father never contacted the Department at any time for visitation nor had he provided financial support to the Department for A.H.'s care during the case. Based on this evidence, the trial court could have formed a firm belief or conviction that the Department demonstrated that Father had not regularly visited or maintained contact with A.H. *See In re J.O.A.*, 283 S.W.3d at 344-45.

As to the third element of subsection N, Father argues that the evidence is insufficient to support a finding that the Department has shown that Father has demonstrated an inability to provide a safe environment. Father argues that the Department cannot make such a showing because he has presented evidence that A.H.'s paternal grandmother is able to provide A.H. with a safe environment. In support of this argument Father cites to *In re D.S.A.*, 113 S.W.3d 567, 573-74 (Tex. App.—Amarillo 2003, no pet.), wherein the Amarillo Court of Appeals stated that "it is quite conceivable that one in prison may still be able to do so by, at the very least, leaving the ward in the capable hands of a relative, friend or spouse." According to Father, although he was not incarcerated, he arranged for A.H.'s paternal grandmother to care for A.H. and "[i]t is disputed within the trial record that the Intervening paternal grandmother is unable, or not competent, to care for [A.H.]."

Once again, we find *In re D.S.A.* factually distinguishable from this case. The parent in *In re D.S.A.* argued that subsection N is inapplicable when the parent is in prison. *See id.* at 573. The Amarillo Court of Appeals concluded that incarceration does not render subsection N inapplicable simply because of incarceration, because an incarcerated person could "work through surrogates, such as relatives, spouses, or friends, to fulfil th[e] obligation [of providing the child a safe environment]." *Id.*

Here, Father has failed to show that he is incarcerated. The fact that a parent who is *not* incarcerated arranges for a relative or someone else to care for the child does not negate other evidence in the record from which a trial court could conclude Father is unable to provide a safe environment for the child. Here, Father did not testify at the termination hearing, and he acknowledges on appeal that it is "disputed" as to whether A.H.'s paternal grandmother is able or competent to care for A.H. Moreover, Father does not dispute that he failed to complete his family service plan. A parent's "failure to complete a family service plan demonstrates an inability to provide a child with a safe environment." *In re A.K.L.*, 2016 Tex. App. LEXIS 13027, at *21). The child's "'environment' includes more than just the physical condition of his or her home. Rather, [it] 'refers to the acceptability of the child's living conditions, as well as a parent's conduct in the home.'" *Id.* at *24 (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)). Father did not argue in the trial court or on appeal that he participated in any services, nor does he contend he made any attempts to complete portions of the plan.[3] CPS Supervisor Hickman testified that he did not complete any services, and he failed to maintain contact with the Department. Hickman testified that Father failed to show

---

[3] We note that Father did not challenge the adequacy or appropriateness of the service plan.

15

that he has any interest in A.H. or in her well-being and safety. According to CPS Investigator Bauch, A.H. did not want to see Father because her last memory of Father was him choking her mother. The CASA testified that A.H. prefers not to see Father because of that traumatic memory. There was sufficient evidence for the trial court to have formed a firm belief or conviction that Father had demonstrated an inability to provide A.H. with a safe environment. *See In re J.O.A.*, 283 S.W.3d at 344-45. Viewing all the evidence in the record in a light most favorable to the trial court's finding of constructive abandonment, as we must in a legal sufficiency review, we conclude the evidence is sufficient to support the finding of constructive abandonment under subsection N. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N).

Having concluded there is legally sufficient evidence to support the trial court's finding that termination was justified under subsection N, we need not address his first and third issues challenging the trial court's findings under subsections F and O, respectively. *See In re A.V.*, 113 S.W.3d at 362 (noting that "only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest"); *see also* Tex. R. App. P. 47.1. Father does not challenge the trial court's finding that termination was in the child's best interest. Accordingly, we overrule Father's second issue. We affirm the trial court's judgment.

16

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on September 11, 2019
Opinion Delivered October 3, 2019

Before McKeithen, C.J., Kreger and Johnson, JJ.