# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00670-CV

---

**A. F., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 425TH JUDICIAL DISTRICT COURT OF WILLIAMSON COUNTY
NO. 20-0087-CPS425, THE HONORABLE BETSY F. LAMBETH, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A.F. (Father) appeals the termination of his parental rights to three children: R.G. (aged 9 at time of removal), J.F. (4), and A.F. (11 months).[1] Father argues that there is legally and factually insufficient evidence to support the district court's findings that termination is the best interest of the children. We affirm.

## BACKGROUND

Father and "Bianca" are the parents of R.G., who was born in 2010. Father and Bianca separated shortly before his birth. For the next five years, R.G. lived with Bianca and his grandmother (Grandmother) and saw Father approximately once a month. Even that contact ceased when Bianca and R.G. moved to Oregon in 2016. In April of 2020, an Oregon court

---

[1] We refer to the children by their initials and their parents by pseudonyms. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(b).

awarded Father custody of R.G., and they returned to Texas, where Father lived with the three children and "Louise"—the mother of J.F. and A.F.—in Round Rock. In November of 2020, the Department of Family and Protective Services removed the children after receiving reports of several incidents of domestic violence in the home.

The Department filed this suit affecting the parent-child relationship seeking temporary custody of the children and to terminate the rights of Father, Louise, and Bianca. The district court appointed the Department temporary managing conservator of the children. R.G. was placed with Grandmother where he remained at the time of trial. The Department initially placed J.F. and A.F. in foster homes but later returned them to Louise's custody. The Department subsequently withdrew its request to terminate Louise's rights and asked the court to appoint her sole managing conservator of J.F. and A.F.

The parties tried the case to the bench over two non-consecutive days in November and December of 2021. Department supervisor Dominique Bush testified that the Department opened an investigation in May of 2020 after receiving a report of domestic violence in the home. She did not provide specifics of the first incident, but the second allegedly occurred on August 29, 2020 at a supermarket in Round Rock. Officer Robert Saucedo of the Round Rock Police Department testified that he responded to a report of three people arguing in the store. He found Father arguing with Louise and "Emily." Officer Saucedo testified that Father was "pacing back and forth pulling on his hair" and "mumbling" unintelligibly. Father did not respond to Officer Saucedo's questions but "kept mumbling and continued pulling his hair from his head." Father eventually told Officer Saucedo that he, Louise, and Emily "were all in a relationship together."

Louise allegedly told Officer Saucedo that Father had assaulted her when she and Emily returned home from Corpus Christi earlier that day. According to Louise, shortly after they arrived, Father pushed Louise into the bathroom and locked the door behind them, holding her down and trying to wrap the belt of a bathrobe around her neck. Louise alleged that she fought back by placing her hands between her neck and the belt, but that Father stomped on her head and tried to cut off her hair with scissors, leading Louise to grab the scissors and force Father to unlock the door so that she and Emily could leave the residence on foot. Officer Saucedo later testified that he observed fresh scratch marks on Louise's left forearm, biceps, and knee and bruising on her thigh and shoulder, and that Father did not respond to his questions but continued saying things such as "Jupiter and Mars had aligned" and "ta, da, ta, da." He then told Officer Saucedo that they were arguing because "it was his girlfriend's birthday and he didn't have any money, and then that his girlfriend had thrown the ring away." Father ultimately admitted to Saucedo that he was angry that the two women had gone to Corpus Christi without him.

The Department contacted Father and Louise at that time, but neither was cooperative according to Bush. The Department contacted Father and Louise again in October of 2020 and offered family-based services, but both declined. In November of 2020, Father and Louise had "a pretty severe physical altercation" where they fought with knives and Father "stomped on [Louise's] head, [and] banged her head on the ground several times." Bush testified that the Department decided to remove the children because Father and Louise were dismissive of the Department's concerns regarding the incident.

Louise testified that Father was violent toward her during their entire relationship, which began in 2013 and ended in December of 2020. Louise confirmed Officer Saucedo's

3

testimony regarding the August incident except that she did not recall saying Father had stomped on her head. He sent her threatening messages for months after the relationship ended, including during trial. Father often came to see her at the bank where she worked until he was given a criminal-trespass warning. After that, he would park across the street and watch the entrance. Sometimes he would "drive around the building playing music really loud" or "would park right next to the drive-up window where [she] was working at and kind of just sitting there and watch."

There was evidence that Father also subjected Louise's mother to similar treatment. Officer Corey Hale of the Austin Police Department testified that he responded to a disturbance at her house in March of 2021. The caller was "hysterical" and could only inform the dispatcher that someone had arrived in a black vehicle. The vehicle was not present when Officer Hale arrived, but both doors of the two-car garage were "smashed in." Officer Hale reviewed footage from a neighbor's security camera that showed a black sedan "pull into the complainant's driveway, run into the garage door, back out and then run into the other garage door." Someone began calling Louise's mother continuously while she was talking to Officer Hale. She answered and put the caller on speaker so that Officer Hale could listen. The caller repeatedly said, "Next time is a fire," asked the location of his children, and said, "[T]his is why this is happening to you." Louise's mother recognized the voice as Father's. Officer Hale testified that he later ascertained that Father drives a black sedan. Several neighbors told Officer Hale that they had seen a similar vehicle idling in front of L.N.'s house on previous occasions.

After the children's removal, the district court ordered Father to complete the service plan drawn up by the Department. The plan required him to complete psychological and

psychiatric evaluations, attend and fully cooperate in counseling sessions, complete a medication evaluation, attend parenting classes, attend a batterer's intervention program, and drug test regularly, among other requirements. The caseworker assigned by the Department testified that she provided Father with referrals containing the contact information for specific providers, but he did not immediately follow up.

Father eventually completed a psychological evaluation with Dr. Frances Gordon in May of 2021. Father reported previous diagnoses of bipolar disorder at the age of fifteen, anxiety, and attention deficit hyperactivity disorder. He also reported a history of suicidal ideation beginning at the age of 15. The most recent suicidal incident was December of 2020, after Louise and Emily ended their relationships with him. Dr. Gordon testified that his responses to the personality assessment showed an unusual degree of "suspiciousness and mistrust in his relations," difficulty acknowledging how his actions affect others, and a tendency to attribute setbacks to external forces. Dr. Gordon diagnosed him with bipolar disorder type I, unspecified anxiety disorder, and an unspecified adjustment disorder. She recommended that he complete a medication evaluation, attend counseling to address his anger issues and domestic violence classes, and undergo regular drug testing.

Dr. Safa Rubaye completed Father's psychiatric evaluation the following month. He diagnosed Father with major depressive disorder and borderline personality disorder. He described the symptoms of borderline personality disorder as a "chronic feeling of emptiness and kind of like low self-esteem and fear of abandonment and also fluctuation in mood." Treatment of borderline personality disorder consists of therapy to help individuals gain the skills necessary to manage the symptoms. Dr. Rubaye recommended that Father start therapy, keep taking

his medications, and attend a parenting class. Without "long term" medication and therapy, Dr. Rubaye believed there would be "no improvement" in Father's symptoms.

The caseworker testified that Father did not begin to follow through with these recommendations until approximately one and a half months before trial. In October 2021, Father met the caseworker's supervisor and accused her of providing incorrect phone numbers. The supervisor called the numbers with him, and all were accurate. Nevertheless, he did not set up a counseling appointment until the week before the trial date. He attended the initial appointment for a batterers' intervention program but left after getting into an argument with the provider. He attended the initial meeting of a parenting class but did not start the course. He never completed the medication evaluation because, as he described it, "that service did not exist."

The caseworker and CASA volunteer Stephanie Gutierrez both testified to Father's continuing erratic behavior. The caseworker testified that Father had "called my bosses claiming things I've not said" and sent group texts to her supervisors. Father's erratic behavior extended to visitations with the children. One incident occurred while the caseworker was observing a Zoom call between Father, J.F., and A.F. Father asked the caseworker to make the image of the children bigger, and she replied that she did not know how to do that when using her phone. Father accused her of lying, told J.F. "this is why we don't trust white people," and ended the call. Gutierrez testified that Father was "kind" at first but then began calling her late at night or early in the morning using "inappropriate language."

Father testified to a different version of the events leading up to the removal of the children and his treatment by the Department. While conceding that there had been incidents of domestic violence, he testified that Louise was the aggressor most of the time. He described

6

an incident in November 2020 (not the one that caused the removal), where Louise "pulled a knife on [him] and held [him] at knife point for about four hours." He claimed the children were present and that R.G. would confirm his version of events. He denied ramming his car into Louise's mother's house and accused Officer Hale of lying. He also stated that the children never witnessed domestic violence prior to that date. Gutierrez testified that R.G. once told her that "[Father] kicked [Louise] in the knee and she fell and then he kicked her in the head, he hurt her a lot."

Father stated that he delayed engaging in services because he was briefly incarcerated and twice checked himself into a mental hospital for treatment of suicidal ideation. He accused the caseworker of hindering his progress by treating him "as a criminal" when he was actually "the victim in the matter." The caseworker, on the other hand, testified that Father told her "a couple of months" before trial that he "didn't need any stupid services."

Father conceded that he had been arrested for violating a protective order "probably more than nine times," twice for domestic violence, and once each for making a terroristic threat, trespassing, and harassing a public servant. He was convicted for violating a protective order in 2011 and 2012 and, at the time of trial, was serving a term of deferred-adjudication probation for five years. Four of the arrests came after the children's removal and he had "a few" outstanding warrants at trial.

The caseworker testified that J.F. expressed excitement about visits with his father but that he and A.F. often appeared bored during the visit. Gutierrez testified that J.F. and A.F. had not asked about Father since December of 2020. The caseworker testified that R.G., in contrast, usually enjoyed visits with Father but recently had become "shutdown" and was unwilling to engage. She described R.G. as "relieved" to learn that he could opt out of visits

with Father. Shannon Overland, R.G.'s therapist, testified that he was "neutral" towards his father and expressed happiness at the thought of adoption by his Grandmother.

The caseworker and Gutierrez both testified that J.F. and A.F. are doing well with their mother, that R.G. is doing well with Grandmother, and that it is in their best interest to make their situations permanent. The caseworker testified that J.F. and A.F. are "very bonded" to their mother. Louise and the caseworker agreed that J.F. and A.F. have not exhibited the "severe violent behavior issues" they displayed in the foster home since their return to Louise's custody. The caseworker recommended that Louise have full custody because it is important that they have a stable and permanent home. Louise's statement that she was willing to allow Father to visit the children under appropriate supervision did not affect that recommendation because, in the caseworker's view, Louise "knows his past history and his behaviors and I think she's very smart enough to know when [Father] is in a good place to see his boys." Gutierrez agreed that it is in the best interest of J.F. and A.F. to remain with Louise and that she has no concerns with Louise's parenting abilities.

The caseworker described R.G. as "very bonded" to Grandmother and observed that they have a "really good relationship." Grandmother meets all of R.G.'s needs, including taking him to all medical, therapy, and tutoring appointments. Gutierrez testified that R.G. expressed to her that he wants to live with Grandmother and asked that his visits with Father be virtual because he was afraid "[Father]'s going to take me away again." The Department plans for Grandmother to adopt R.G., who has expressed willingness to do so. Gutierrez testified that termination is in R.G.'s best interest so that he can have a stable home with Grandmother.

After closing arguments, the district court found with respect to Father that the Department had proven by clear and convincing evidence three predicate grounds for termination

and that termination is in the best interest of each child. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (b)(2). In two orders, the district court rendered judgment terminating Father's rights to the children and appointing the Department permanent managing conservator of R.G., and appointing Louise sole managing conservator of J.F. and A.F.[2] Father appealed, challenging the sufficiency of the evidence to support the best-interest determinations.

## ANALYSIS

A court may order termination of the parent-child relationship if "clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

The heightened standard of proof "necessitates a commensurately heightened standard of review." *Id.* at 626. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. at 630. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. Factual-sufficiency review, on

---

[2] The district court also terminated Bianca's rights. She did not appeal.

the other hand, "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

Father concedes that the Department proved at least one statutory ground for termination but challenges the sufficiency of the best interest finding. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)). The Department's burden "is not simply to prove that a parent should not have custody of her child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with her child whatsoever." *Id.*

In determining the best interest of the child, we consider the non-exclusive *Holley* factors:

- the children's wishes;

- the children's present and future emotional and physical needs;

- any emotional and physical danger to the children now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist the individuals seeking custody to promote the best interest of the children;

- the plans for the children by the individuals or agency seeking custody;

- the stability of the home or proposed placement;

- parental acts or omissions which may indicate that the existing parent-child relationship is improper; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). A best-interest finding does not require proof of a specific factor or set of factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

Regarding the physical and emotional danger to the children, the record supports that Father committed numerous incidents of domestic violence while the children were present in the home. R.G. told Gutierrez that he watched Father kick Louise in the head during one of these incidents, and Father testified that R.G. witnessed a different incident. His violent behavior was not limited to Louise—at least five women held protective orders against him, and he was arrested at least nine times for violating those orders. He was arrested twice for domestic violence and, on other occasions, for making a terroristic threat, trespassing, and harassing a public servant. Four of the arrests came after the children's removal, and he was incarcerated once during the pendency of the case. Additionally, the evidence supports an inference that Father was the perpetrator of the attack on Louise's mother's house. Father's criminal activity,

including the domestic violence, supports the best interest finding. *See In re J.D.U.*, No. 04-21-00527-CV, 2022 WL 947571, at *3 (Tex. App.—San Antonio Mar. 30, 2022, no pet. h.) (mem. op.) ("Evidence of a parent's history of domestic violence supports a trial court's best-interest finding."); *In re A.J.E.M.-B.*, No. 14-14-00424-CV, 2014 WL 5795484, at *14 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.) (noting that "evidence of parent's inability to maintain a lifestyle free from arrests and incarcerations is relevant to best interest determination").

When asked about his plans for the children, Father testified that he planned for them to remain in their current homes while he addresses his pending criminal charges. He declined to provide any details about how he intended to resolve the charges or how he would support the children if incarcerated. "A parent's current and future incarceration is relevant to his ability to meet the child's present and future physical and emotional needs, and the parent's incarceration at the time of trial makes his future uncertain." *E.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00427-CV, 2018 WL 6056959, at *3 (Tex. App.—Austin Nov. 20, 2018, pet. denied) (mem. op.). Even if incarceration were not an issue, Father has not shown an ability to provide for the children. He had five jobs since December of 2020 and was homeless at times during the pendency of the case. At the time of the psychological evaluation, Father was living and working at a Motel 6. He testified at trial that he is currently self employed as a mechanic making $2,000 a month but had not made child support payments. Father explained that he does not "want to give [his] kids money" and preferred to provide them with "shoes, clothes, toys, things of that nature." Moreover, Father admitted that he smoked marijuana regularly while caring for the children but denied that A.F. tested positive because of his use. Father's drug use, financial problems, and inability to maintain a stable residence

12

supports that he would be unable to provide a stable home for the children.  *See In re T.L.B. Jr.*, No. 01-16-00806-CV, 2017 WL 1019520, at *11 (Tex. App.—Houston [1st Dist.] Mar. 16, 2017, no pet.) (mem. op.) ("A parent's drug use has also been found to be a condition that can indicate instability in the home environment."); *In re S.R.*, 452 S.W.3d 351, 367 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs.").

Evidence that Father failed to engage with services also supports the best-interest finding.  *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013).  The Department prepared a service plan for Father that required him to complete psychological and psychiatric evaluations, attend and fully cooperate in counseling sessions, complete a medication evaluation, attend parenting classes, attend a batterer's intervention program, and drug test regularly.  After completing the evaluations, Father made no attempt to follow through with the recommendations—or engage any of the other services—until approximately a month before trial.  He did not set up a counseling appointment until the week before the trial date, and only attended one meeting of the batterers' intervention program and the parenting class.  He never completed the medication evaluation because, as he described it, "that service did not exist" and stated that psychiatric medications would not help his depression.

Father insists that his actions were "not so egregious that they demand termination of his parental rights on their own" and that the record shows he did the best he could under the circumstances.  As ostensible support for this argument, he points to his testimony that he that he was not the principal aggressor in the altercations with Louise, that he did not damage her mother's house, and that the caseworker prevented him from accessing the services he needed. He insists that he engaged with the Department as much as possible given his incarceration,

13

hospitalization, and the caseworker's hostility. However, the district court is "the sole arbiter when assessing the credibility and demeanor of witnesses." *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). Here, the district court could reasonably have disregarded his testimony and instead credit other testimony that he was not interested in taking the steps necessary to regain custody until shortly before trial. *See In re J.G.S.*, 574 S.W.3d at 114 ("We are not to 'second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible.'" (quoting *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003))).

Father nevertheless argues that termination is unwarranted because the record shows that he can maintain his relationship with the children without endangering them. In essence, he argues that the status quo at the beginning of trial serves the best interest of the children by enabling them to maintain the parent-child relationship safely. He also points to the testimony of Dr. Gibson and Dr. Rubaye that he would benefit from therapy and argues that nothing in the record shows he would not be able to progress if afforded more time. While courts must recognize a parent's constitutional right to his children, "it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *See C.H.*, 89 S.W.3d at 26. Gutierrez testified that R.G. expressed fear that Father would "take [him] away" from Grandmother and that R.G. needed to know his situation was permanent. The caseworker testified that J.F. and A.F. are "very bonded" to their mother and have not exhibited the "severe violent behavior issues" they displayed in the foster home since their return to Louise's custody. Louise and the caseworker agreed that termination is the best interest of J.F. and A.F. so that Louise can protect them from Father's instability. "A child's need for permanence through the establishment of a stable, permanent home' is 'the paramount

consideration in a best-interest determination.'" *See E.N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at *8 (Tex. App.—Austin June 17, 2021, no pet.) (mem. op.) (quoting *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)). By his own admission, Father could not provide such a home at the time of trial and based on this record, the district court could have reasonably concluded he would not be able to in the future. *See In re J.O.H.*, 617 S.W.3d 596, 599 (Tex. App.—San Antonio 2020, no pet.) ("[I]n determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct.").

Considering the entire record, we conclude that the disputed evidence is not so significant that the factfinder could not have formed a firm belief or conviction that termination is the best interest of the children. *See In re J.D.U.*, 2022 WL 947571, at *3 (upholding best-interest finding based on repeated episodes of domestic violence); *In re S.R.*, 452 S.W.3d at 370 (upholding best-interest finding "based on the Father's lack of stable housing, lack of stable employment, noncompliance with services, pattern of domestic violence, and other criminal behavior that resulted in periods of incarceration, even while these proceedings were pending"). Because the evidence is factually sufficient to support the challenged finding, it is necessarily legally sufficient to do so. *See K.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00116-CV, 2020 WL 4462320, at *4 (Tex. App.—Austin July 15, 2020, pet. denied) (mem. op.) ("Evidence that is factually sufficient to support a trial court's finding necessarily satisfies the legal-sufficiency standard."); *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.) ("If the evidence is factually sufficient, then it is necessarily legally sufficient as well."); *In re M.V.G.*, 440 S.W.3d 54, 60 (Tex. App.—Waco 2010, no pet.) ("[B]ecause the evidence is factually sufficient, it is

15

necessarily legally sufficient" (citing *In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.))).

We overrule Father's sole issue.

## CONCLUSION

We affirm the district court's orders.

 

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed:   June 9, 2022