**Opinion issued June 8, 2023**



In The

# Court of Appeals

### For The

## First District of Texas

_____

### NO. 01-22-00964-CV

_____

## IN THE INTEREST OF S.C.M., A CHILD

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-00637J**

---

### MEMORANDUM OPINION

B.C. ("Father") appeals from a judgment that terminated his parental rights to his child, S.C.M. ("Sarah").[1] *See* TEX. FAM. CODE § 161.001. Father complains that the evidence was legally and factually insufficient for the trial court to have found that he committed the predicate acts in Texas Family Code section

---

[1]     We use a pseudonym to refer to the child and parent involved in this case. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

161.001(b)(1)(D) (endangering environment) and (E) (endangering conduct), and that termination was in the best interest of the child. We affirm.

## Background

Three years before Sarah was born, Father was convicted of felony aggravated robbery involving a deadly weapon. He was placed on community supervision for eight years, which required him to avoid illegal drugs, report to a supervision officer, and not commit illegal offenses.

Sarah was born in January 2021, and one month later, Father tested positive for an illegal drug in violation of his community supervision. At the time of Sarah's birth, Father and Sarah's mother were in an on-and-off relationship and did not have secure housing, moving between hotels. Mother told a caseworker that she had been in a relationship with Father for about two years. In March of 2021, the Department received a referral of neglectful supervision concerning Sarah. Mother believed that Father made the report. The reporter stated that Father and Mother were having a verbal altercation in front of Sarah in a hotel lobby. When Father leaned in to kiss Sarah, Mother punched him, and he fell. The police were called. Upon investigating the referral, the Department noted that Mother had prior involvement with the Department regarding her mental health and medications and that she had been diagnosed with bipolar disorder, depression, and attention deficit

2

hyperactivity disorder. There was concern that her mental health was impairing her judgment and ability to care for an infant.

A caseworker from the Department contacted Mother, who indicated she was staying at the Star of Hope homeless shelter. Mother acknowledged that she had mental health issues but stated that the referral happened because Father was upset that she did not want to be in a relationship with him. The Department attempted to contact Father at different addresses and phone numbers but was unsuccessful.

In April 2021, the Department received a referral from the shelter that Mother was not taking her prescribed medications. She was disorganized and confused. She was disassociating during therapy, and there were concerns about her ability to care for herself and a baby. A therapist recommended that Mother go to the hospital, and a maternal grandparent agreed to care for Sarah.

One week later, Mother was released from the hospital back to the shelter. Due to concerns about Mother's ability to care for herself and Sarah, Mother was asked if she would be willing to place Sarah outside her care while she completed services. A family member was not available for a placement. Mother told the caseworker that she did not agree to the child being cared for by someone else, and she also had no family members or friends available. The next day, the Department

3

requested temporary managing conservatorship of Sarah, listing Mother and Father as the child's alleged parents, and noting that Father's location was unknown.

Mother and Father appeared at the first adversary hearing. The court continued the appointment of the Department as temporary managing conservator. The court ordered that the parents comply with certain actions and advised that failure to do so could lead to termination. Father was required to provide a caregiver resource form and contact information within 30 days.

In June 2021, Father was formally served with the suit and his service plan was filed with the court. The plan noted concerns with Father's history of intimate partner violence that had not been resolved and that Father was unemployed and without stable housing. The plan required Father to (1) obtain and maintain employment, (2) obtain and maintain housing, (3) participate in meetings, conferences, and court, (4) submit to paternity testing, (5) participate in monitored visits with the child, (6) refrain from criminal activity, (7) provide drug testing samples, and (8) participate in a psychological assessment and follow its recommendations.

On June 30, 2021, Father appeared at the court's status hearing and paternity was established. Father's service plan was made an order of the court. Father was also found to be in violation of the court's order from a previous hearing, and

Father had not provided a caregiver resource form. The next day, both parents were ordered to drug testing. Father did not appear.

In July and August 2021, Father did not report to his community supervision officer. At some point in August, Father became incarcerated in Fort Bend County Jail. He was later transferred to Harris County Jail, and in December 2021, the criminal court revoked Father's community supervision for his prior aggravated robbery with a deadly weapon charge. He was sentenced to eight years' imprisonment. From December 2021 through the end of trial, Father frequently moved units within the Texas prison system.

At a permanency hearing in December 2021, Father was found not in compliance with the family plan. Mother also tested positive for drugs in both hair and urine samples.

The case proceeded to trial, which took place in April, June, August, and November 2022.[2] Over the course of the four court dates, the caseworker and child advocate testified.

### 1.    April 2022 trial

At trial, the Department's caseworker testified that the Department received a referral about a physical dispute between the parents in a hotel lobby. Mother allegedly punched Father while she was holding the baby. The parents did not have

---

[2]     At the conclusion of trial, the district court terminated mother's parental rights to Sarah. Mother's parental rights are not the subject of this appeal.

stable housing and had been staying in hotels. At some point after the altercation, Mother went to a homeless shelter with Sarah and expressed that she did not want a relationship with Father due to domestic violence. The Department was concerned that Sarah could be harmed due to domestic violence. Mother had one prior case with the Department regarding her mental health. The case was closed after Mother began counseling, and Mother later placed the child who was the subject of that prior case for adoption.

The caseworker testified that while the intake of the current case was still open, the Department received a second intake report alleging that Mother was not taking her medication, that she was experiencing confusion, and that she required "prompting to reality" during therapy. When asked to explain the prompting to reality, the caseworker stated that it was as if Mother was gazing off and inattentive. Mother's lack of mental presence had been a concern in her first case with the Department, and the Department was especially concerned with this allegation because a baby requires constant attention and care.

Mother was admitted to Ben Taub hospital and diagnosed with postpartum depression, and a maternal relative cared for the child. After her hospitalization, Mother returned to the shelter. The caseworker remained concerned that Mother was unable to care for a newborn while addressing her own mental health issues.

Mother did not name any family or friends who could care for the child, and the Department sought temporary managing conservatorship of Sarah.

The caseworker did not confirm or deny that Father made the initial referral to the Department in March of 2021. The caseworker testified that Father never affirmatively contacted the Department during its initial investigation. The Department was unable to reach Father. Neither parent provided suggestions for placement of the child with relatives.

### 2. June 2022 trial

The caseworker testified that Sarah was doing well in her foster placement and that her foster parent met her needs. The Department's goal was adoption. The caseworker last spoke with Mother in May, and she had moved back to Houston from Illinois. Though he had reached out several times, the caseworker did not receive a response from Mother. Mother's instability continued to be a concern. The caseworker noted issues with Mother's psychological health and noted that she had tested positive for drugs in December 2021 and February 2022.

The caseworker acknowledged that Father's paternity was not adjudicated until after the lawsuit began. Therefore, Mother was the parent with rights and responsibilities before the Department became involved. By the time Father's rights were adjudicated, the Department bore responsibility for the child.

### 3. August 2022 trial

The caseworker testified that his last contact with Father was in June 2022. Father informed the Department of his unit in prison and asked for a photograph of Sarah. The caseworker testified that Father was in prison for aggravated robbery with a deadly weapon and that Father had been sentenced to eight years' imprisonment after he failed to report to a supervision officer. The caseworker confirmed that prior to his incarceration, Father had received the family service plan and that it had been explained to him. Father completed a paternity test and psychological assessment. He did not complete court-ordered drug testing. While he completed parenting classes and individual therapy, he did not provide proof that he had completed domestic violence classes.

As for Father's relationship with Sarah, he attended only one scheduled visit in June 2021. Father became incarcerated in August 2021. The caseworker reiterated that Father never provided contact information and potential placement names to the Department. He acknowledged that Father had charges for domestic violence in addition to his incarceration for aggravated robbery. Father did not provide any financial support or gifts for the child during the case, and Sarah was not bonded to Father.

### 4.    November 2022

The caseworker testified that he did not believe that Father had shown that he could provide a safe and stable environment for Sarah. According to the caseworker, both parents were living in and out of hotels when the case began. When Mother took the child to a shelter, Father did not contact the Department or otherwise attempt to establish his rights. Father did participate in a status hearing and completed some services before going to jail. The caseworker stated that Father's potential release date is in 2028. The caseworker testified that Mother had complained that Father was physically threatening and that, at some point, a court had ordered no contact between the parents.

At this trial date, a paternal cousin who was interested in caring for Sarah was present. The caseworker testified that the Department completed a home study, and the relative was willing to adopt Sarah. Sarah was nearly two years old and had no relationship with the relative. The caseworker testified that Father had provided the cousin's name following the last court date and expressed concern about the best placement option for Sarah.

A coordinator for Child Advocates testified that Sarah had been in her current foster placement for 14 months and was doing well. She was securely bonded to the foster mother, who wanted to adopt Sarah. The child advocate did not recommend moving Sarah due to her age. Based on what she knew of Father,

he could not provide a safe and stable environment for Sarah. She confirmed that she was asking for termination of Father's rights and believed it was in Sarah's best interest.

The trial court terminated Father's rights to Sarah, finding that termination was authorized based on sections 161.001(b)(1)(D), (E), (N), and (O). The court also found that the termination was in the Sarah's best interest. The court ordered that Sarah remain with her foster mother.

On appeal, Father challenges the sufficiency of the evidence to support the trial court's predicate act findings and the trial court's finding that termination was in Sarah's best interest. We affirm.

**Standard of Review**

A trial court may order termination of the parent-child relationship if the Department proves, by clear and convincing evidence, one of the statutorily enumerated predicate findings for termination and proves that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (recognizing that federal Due Process Clause and Texas Family Code both mandate "heightened standard of review" of clear and convincing evidence in parental-rights termination cases). The Department must prove by clear and convincing evidence both a statutorily prescribed predicate finding and that termination is in the child's best interest. *Id.*

10

at 803. The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

To assess the legal sufficiency of the evidence in a termination proceeding, we consider all evidence in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. When "no reasonable factfinder could form a firm belief or conviction" that the matter on which the Department bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id.* In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id.* The evidence is factually insufficient if, considering the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

We defer to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of the witnesses. *See id.* at 109.

## Predicate Acts

In his first issue, Father contends that the evidence is insufficient to support a finding based on the predicate acts of endangerment. *See* TEX. FAM. CODE §161.001(b)(1)(D), (E). The Department responds that Father failed to challenge all the predicate acts on which his rights were terminated, namely section 161.001(b)(1)(N) (abandonment) and section 161.001(b)(1)(O) (failure to complete court-ordered service plan). The Department contends that we must affirm the trial court's predicate act finding because Father failed to challenge all the findings. Father filed a late reply brief alleging that the evidence is insufficient to support the trial court's findings under section 161.001(b)(1)(N) (constructive abandonment) and (O) (failure to complete court-ordered service plan).[3] Father argues that we should consider the sufficiency of the evidence to support the remaining predicate act findings in the interest of justice and because the Department's brief alleged that they were waived.

---

[3]    Father did not file a motion to file a late reply brief.

12

The termination judgment reflects that Father's parental rights were terminated based on four predicate grounds: endangering environment (subsection (D)); endangering conduct (subsection (E)); constructive abandonment (subsection (N)); and failure to comply with a court-ordered service plan (subsection (O)). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), (O). Father's original appellate brief challenges only the endangering environment and endangering conduct grounds, but not the grounds of constructive abandonment and failure to complete a service plan.

While the Rules of Appellate Procedure permit an appellant to file a reply brief to address matters in the appellee's brief, the Rules of Appellate Procedure "do not allow an appellant to include in a reply brief a new issue in response to some matter pointed out in the appellee's brief but not raised by appellant's original brief." *Howell v. Texas Workers' Comp. Comm'n*, 143 S.W.3d 416, 439 (Tex. App.—Austin 2004, pet. denied) (citing TEX. R. APP. P. 38.1); *accord Boze v. Cartwright*, No. 01-19-00892-CV, 2020 WL 7776018, at *3 (Tex. App.—Houston [1st Dist.] Dec. 31, 2020, no pet.) (mem. op.); *Warwick Oil & Gas, Inc. v. FBS Props., Inc.*, No. 01-14-00290-CV, 2015 WL 3637988, at *9 (Tex. App.—Houston [1st Dist.] June 11, 2015, no pet.) (mem. op.). By failing to challenge the finding under subsections (N) and (O), Father waived any complaint about the sufficiency of the evidence to support these findings.

Because of this, if we determine that the evidence was legally sufficient for the trial court to have found that termination was in the best interest of the child, we will affirm the judgment of termination as to Father. See TEX. FAM. CODE § 161.001(b) (requiring only one predicate ground to support termination); *In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019) (per curiam) (stating that "only one ground is required to terminate parental rights"). However, we note that Father challenged the sufficiency of the evidence under subsections (D) and (E), which raise due process concerns that require us, nevertheless, to address the merits of his contentions. *In re N.G.*, 577 S.W.3d 230, 235–36 (Tex. 2019). Because we find the evidence was sufficient to satisfy subsections (D) and (E), we note that Father's briefing waiver was harmless.

## A.     Subsections 161.011(b)(1) (D) or (E)

Because Father challenges the trial court's findings under subsections (D) and (E), thus implicating due process concerns, we analyze the sufficiency of the evidence of these two subsections. *In re N.G.*, 577 S.W.3d at 235–36.

Family Code subsection 161.001(b)(1)(D) provides that the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Termination under

14

Family Code subsection 161.001(b)(1)(E) requires clear and convincing evidence the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). "Conduct" includes acts and failures to act. *In re V.A.*, 598 S.W.3d 317, 331 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

Subsections (D) and (E) differ in that (D) requires a showing that the environment or conditions in which the child is placed endangered the child's physical or emotional well-being, while subsection (E) requires that the cause of the endangerment be the parent's conduct alone, as evidenced by either the parent's actions or omissions. TEX. FAM. CODE § 161.001(b)(1)(D), (E). "Because subsections D and E both concern endangerment and the evidence on each may overlap in some respects, we address both of these predicate findings together." *In re S.R.*, 452 S.W.3d 351, 359–60 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

As used in section 161.001, "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this context, endanger means to expose a child to loss or injury or to

jeopardize a child's emotional or physical well-being. *Id.*; *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

The Department does not need to establish that a parent intended to endanger a child to support termination based on endangerment. *M.C.*, 917 S.W.2d at 270. Nor is it necessary to establish that the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *See Boyd*, 727 S.W.2d at 533. Danger to a child's well-being may be inferred from parental misconduct. *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Boyd*, 727 S.W.2d at 533). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Among the types of actions or omissions constituting evidence meeting this standard are criminal activity, convictions, and incarceration. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc). "Evidence of criminal conduct, convictions, imprisonment and its effects on a parent's life and ability to parent, may establish an endangering course of conduct." *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727

16

S.W.2d at 533–34. When all the evidence, including evidence of imprisonment, shows a course of conduct that has the effect of endangering the physical or emotional well-being of the child, a finding of endangerment is supportable. *Walker*, 312 S.W.3d at 617. Routinely subjecting a child to the probability that she will be left alone because her parent is in jail endangers children's physical and emotional well-being. *Id.* A parent's past endangering conduct may support an inference that past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See id.*

The record reflects that in 2019, three years before Sarah was born, Father pleaded guilty to felony aggravated robbery with a deadly weapon. He was placed on community supervision for eight years. The supervision required that he not use illegal drugs, refrain from committing illegal offenses, and report to a supervision officer as directed.

The State's motion to adjudicate documented that within one month of Sarah's birth, Father tested positive for an illegal drug. This behavior put him at risk for impairing his ability to protect and provide for Sarah's welfare because it put him at risk of incarceration for violating the terms of his supervision. Parents' criminal conduct that exposes them to the possibility of incarceration can negatively impact a child's living environment and emotional well-being. *In re*

17

*A.A.H.*, No. 01-19-00612-CV, 2020 WL 1056941, at \*10 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.).

The record reflects that at the time of Sarah's birth in February 2021, Mother and Father had been in an on-and-off relationship for two years. They did not have stable housing and were moving between hotels. The Department became involved when Father and Mother had an altercation in a hotel lobby. Sarah was present and about two months old. It was reported that Mother punched Father when he attempted to kiss the baby goodbye. Mother then went to Star of Hope shelter with the baby. When the Department interviewed Mother at Star of Hope, she stated that Father had called in the referral and that she was fleeing from domestic violence. At trial, the caseworker testified that Mother told her she was not the aggressor and that Father hit her. "Domestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Violence does not have to be directed toward the child or result in a final conviction. *In re V.V.*, 349 S.W.3d at 556 ("Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction."). The district court could have formed a firm belief that Sarah was at risk for exposure to domestic violence both based on environment and Father's conduct.

Father argues that he could not have endangered Sarah because he was not adjudicated the parent until after the Department was her conservator. But the uncontroverted evidence establishes that Father was aware of at least the substantial likelihood that he was Sarah's father. At the time of Sarah's birth, Father had been in a relationship with Mother for a few years. Father was seen with Sarah when she was about two months old during the hotel lobby altercation. The record reflects that once Mother took Sarah to a shelter, Father did not attempt to establish his paternity, custody, or rights. At minimum, it is alleged that he contacted the Department to report that Mother hit him in front of Sarah, Father did not pursue establishment of his paternity or seek opportunities to care for Sarah and ensure her safety.

Furthermore, the record reflects that once the Department became the temporary managing conservator of Sarah, Father failed to provide names of potential placements for Sarah, jeopardizing Sarah's welfare. The court eventually ordered Father to provide the caregiver resource and child placement resources forms to the Department. The record does not reflect that he completed the resource form, and he only provided a possible placement for Sarah near the end of trial.

The uncontroverted evidence also establishes that Father did not have or obtain stable housing or employment either before or during the pendency of the

case. In June 2021, Father reported to the Department that he was unemployed and did not have stable housing. Throughout the pendency of this case, Father failed to provide financial or material support to Sarah or to arrange for a relative or friend to provide for her in his stead.

Finally, the court could have considered Father's refusal to submit to drug testing and his criminal activity. Shortly after his rights were adjudicated, Father failed to submit to court-ordered drug testing. The trial court was entitled to find his failure to participate in the drug tests as equivalent to a positive test result. *See In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *6 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.) (stating failure to participate in court-ordered drug test may be treated as positive test result by trial court). The record reflects that while the parental-rights case was pending, Father violated the terms of his community supervision by failing to report to his supervision officer for two months. He was sentenced to eight years' imprisonment. While the mere fact of a conviction does not support termination, the fact of a conviction—when considered with the duration and consequences of the incarceration—are relevant to determining if the resulting abandonment presents a risk to the child's physical or emotional well-being. *In re J.F.-G.*, 627 S.W.3d 304, 315 (Tex. 2021). On this record, the trial court could have found that Father's robbery conviction, combined with his lack of employment or housing,

the allegations of domestic violence between him and Sarah's mother, the failure to provide financial support or surrogate caregivers during the case, the skipped drug test, and failure to report to his probation officer, put Sarah's physical and emotional well-being at risk.

Viewing the evidence in the light most favorable to the trial court's findings, a reasonable factfinder could have formed a firm belief or conviction that the Department's allegations that Father "knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" and "knowingly placed the child with person who engaged in conduct which endangers the physical or emotional well-being of the child" were true. TEX. FAM. CODE § 161.001(b)(1)(D), (E); *In re E.N.C.*, 384 S.W.3d at 802 (stating standard of review in termination of parental rights cases). We hold that legally and factually sufficient evidence supports the trial court's findings that Father committed these statutory predicate grounds for termination of his parental rights to Sarah.

**B.    Additional Issues Raised in Reply Brief**

Since there is sufficient evidence to support the trial court's findings regarding the predicate acts related to endangerment, we are not required to address the sufficiency of the evidence for the remaining two predicate acts. *In re Z.M.M.*, 577 S.W.3d at 542 (stating that "only one ground is required to terminate

parental rights"). In this case, however, the evidence supports the trial court's findings under both additional predicate grounds.

### 1.     Subsection 161.001(b)(1)(N)

A trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has constructively abandoned the child. TEX. FAM. CODE § 161.001(b)(1)(N). To prove constructive abandonment, the Department must establish four elements: (1) the child has been in the permanent or temporary managing conservatorship of the Department for not less than six months; (2) the Department has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. *Id.*; *see In re L.E.R.*, 650 S.W.3d 771, 785–86 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (applying statutory requirements to fact); *In re G.K.G.A.*, No. 01-16-00996-CV, 2017 WL 2376534, at *4–7 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.) (same).

On appeal, Father disputes only the fourth element. He contends that the Department failed to meet its burden to conclusively establish that he demonstrated an inability to provide the child with a safe environment. He argues that any evidence of his failure to provide a safe environment is conclusory. He also argues that he met this requirement by providing a cousin willing to adopt Sarah.

22

At the final trial date, the Department testified that Father's purported cousin was present and willing to adopt Sarah. The Department had conducted a home study of the cousin and her husband, and though there were some concerns with it, the Department believed that placement with the cousin could be appropriate. The caseworker testified that the cousin had no relationship with Sarah. While the availability of family members or other surrogate caregivers to take care of a child while a parent may be temporarily unable to do so should be considered in a determination of whether a parent has constructively abandoned a child, it is not the only factor. *In re D.S.A.*, 113 S.W.3d 567, 573–74 (Tex. App.—Amarillo 2003, no pet.) (considering availability of family members to care for child, parent's lack of permanent resident, unstable employment history, drug use, and failure to maintain contact with child). The trial court could have credited the cousin's interest in placement of Sarah in favor of Father and yet found that Father could not provide a safe environment for Sarah.

Several factors are relevant to a determination that a parent cannot provide a safe environment, including (1) the degree to which a parent participated in services; (2) whether the parent had steady housing and employment; (3) whether the parent missed opportunities for counseling and a psychological evaluation. *In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *9 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.). "The factfinder should also

consider a parent's financial resources, employment history, home environment, parenting skills, and demonstrated past ability or inability to care for a child." *Id.* (quotation and citation removed). "The burden is not on the parents to prove that they can provide a safe environment for the children; the burden is on the Department, as the party seeking termination of parental rights, to prove that the parents are unable to provide a safe environment for the child." *Id.*

The uncontroverted evidence showed that Father had no employment history, no financial resources, and no stable housing. When Sarah was one month old, Father and Mother were staying at various hotels. The record does not support that Father found stable housing after Mother and Sarah went to a shelter.

Father also did not demonstrate a relationship with Sarah. Father, Mother, and Sarah were together in March 2021. After that point, Father did nothing to assert his rights or establish custody to Sarah. Once his parental rights were adjudicated in June 2021, he was ordered to have weekly visits with Sarah. The record reflects that he attended only one weekly visit. The record reveals that Father likely knew Sarah to be his child as early as one or two months after her birth, when he was in the physical altercation with Mother in front of Sarah. The evidence shows that Father has not maintained a relationship with Sarah, paid support, or made any arrangements to provide Sarah with food, clothing, or care.

24

In June 2021, Father was ordered to drug-testing by the court. He did not appear. In July and August 2021, Father did not report to his supervision officer. Father was on community supervision for an aggravated robbery with a deadly weapon. He was required as part of that supervision to report to the supervision officer. This failure led to his incarceration for eight years, until 2026. "Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *V.V.*, 349 S.W.3d at 554 (citing *Boyd*, 727 S.W.2d at 533) ("[I]mprisonment is certainly a factor to be considered by the trial court on the issue of endangerment.)); *see Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (holding parent's past criminal conduct, before and after child's birth, relevant to showing of inability to parent). The trial court as factfinder could have reached a negative conclusion about Father's ability to parent based on his instability.

The evidence adduced at trial supported the trial court's conclusion that Father constructively abandoned Sarah, and the disputed evidence regarding Sarah's potential placement with the cousin is not so significant that a reasonable factfinder could not form a firm belief or conviction of this finding. *J.F.C.*, 96 S.W.3d at 266.

## 2.      Subsection 161.001(b)(1)(O)

Father's reply brief also contends that the evidence was legally and factually insufficient to support the trial court's predicate findings that termination was warranted under Family Code subsection 161.001(b)(1)(O).

Subsection (O) provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under [Family Code] Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE § 161.001(b)(1)(O). Thus, pursuant to subsection (O), the Department must prove that (1) it has been the child's temporary or permanent managing conservator for at least nine months; (2) it took custody of the child as a result of a removal from the parent under Chapter 262 for abuse or neglect; (3) a court issued an order establishing the actions necessary for the parent to obtain the return of the child; and (4) the parent did not comply with the court order. *See id.*

On appeal, Father argues that Sarah was not removed for abuse or neglect, but instead for lack of availability of a caretaker while Mother sought treatment for mental illness. He also argues that it was impossible for Father to complete the

family service plan because Father was incarcerated and subject to frequent moves within the prison system.

The record reflects that Sarah was removed for neglect. The Department's original petition requests permission to take possession of Sarah because "[t]here is an immediate danger to the physical health or safety of the child, or the child has been the victim of neglect or sexual abuse or of trafficking. . . ." The removal affidavit states that once Mother was released from Ben Taub hospital, the Department remained concerned that Sarah would be neglected and placed in harm's way by Mother. The Department asked Mother if she was willing to place the child with someone while she completed mental health services. Mother refused. She was unable to provide the names of anyone her daughter could be placed with and told the Department that the agency would need a court order to remove her child. The Department attempted to speak with staff of Star of Hope regarding monitoring Mother and Sarah, but the facility does not provide monitors. The Department's caseworker testified at trial that the Department was concerned that Mother's mental health issues would impair her ability to care for Sarah, as young infants require constant attention. During this time, Father was unreachable. He did not contact the Department, seek custody, call authorities, or otherwise attempt to ensure Sarah's well-being. Contrary to Father's assertion on appeal, the record reflects that Sarah was removed for neglect.

Regarding Father's service plan requirements, the court-ordered plan required him, among other things, to obtain and maintain stable housing and employment, to attend all court hearings and meetings, to attend weekly visits with Sarah, to submit to drug testing, to avoid criminal activity, to submit to DNA testing, to complete a parenting class, and to complete a psychosocial evaluation. Father was present in court when the service plan became a court order. The record reflects that Father did not complete the service plan. There is no evidence in the record that Father obtained stable housing nor is there any evidence of Father's employment. While he completed DNA testing and a psychosocial evaluation, he did not complete the recommended follow-up services. The Department did not receive proof that he completed domestic violence services or participated in individual counseling. Father also did not appear for court-ordered drug testing.

Texas courts generally take a strict approach to subsection (O)'s application, *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.), and a parent's failure to complete one requirement of his family service plan supports termination under that subsection, *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Nonetheless, Father appears to argue that termination under subsection (O) is not justified based on the affirmative defense found in Family Code subsection 161.001(d):

> (d) A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision

of a court order if a parent proves by a preponderance of evidence that:

> (1) the parent was unable to comply with specific provisions of the court order; and

> (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

TEX. FAM. CODE § 161.001(d). Specifically, Father argues that once he became incarcerated in August 2021, he could not complete the service plan.

Section 161.001(d) places the burden on the parent to prove by a preponderance of the evidence that he was unable to comply with the court-ordered service plan, that he made a good faith effort to comply with the order, and that his failure to comply is not attributable to any fault of his own. *See id.* The record supports the district court's finding that Father failed to satisfy that burden. The case began in April 2021 and the service plan became a court order in June 2021. Father was not incarcerated until August 2021. The caseworker testified that Father did not complete services before he was incarcerated. Father did not obtain proof of stable housing or employment. He did not participate in drug testing. He attended only one weekly visit with Sarah beginning in June 2021. While he completed a psychosocial assessment, he did not complete any of the recommended services such as a parenting class, individual therapy, or domestic violence classes. To the extent Father's failure to comply with the service plan

29

could be explained in part due to his incarceration, the record supports the district court's finding that, in the months before his incarceration, Father had not attempted in good faith to comply with the order and that his failure to comply was attributable at least in part to his own fault. *See D.L.S. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-20-00369-CV, 2020 WL 7041564, at *4 (Tex. App.—Austin Nov. 30, 2020, no pet.) (mem. op.) (holding Father did not meet section 161.001(d) burden when he did not complete services in five months before incarceration); *W.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00713-CV, 2020 WL 1281643, at *5 (Tex. App.—Austin Mar. 18, 2020, pet. denied) (mem. op.) (concluding that record supported district court's finding that parent failed to meet his burden to show good-faith attempt to comply when evidence "showed that he did not comply with the court-ordered services during the time period that the case was pending and he was not incarcerated").

* * *

Having concluded that Father failed to challenge all the predicate act findings in his original brief, that the evidence was legally and factually sufficient to support the two endangerment grounds, and that, even if we were required to analyze it, the evidence further supported the (N) and (O) grounds, we overrule Father's first issue related to the predicate act findings.

30

## Best Interest

Father challenges the legal and factual sufficiency of the trial court's best-interest finding.

## A.    Legal Principles

In *Holley v. Adams*, the Supreme Court of Texas identified several non-exclusive factors that we consider when determining whether the termination of a parent's rights is in the child's best interest. 544 S.W.2d 367, 371–72 (Tex. 1976). The factors include: (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) the current and future physical danger to the child; (4) the parental abilities of the person seeking custody; (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child; (6) the plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not proper; and (9) any excuse for acts or omissions of the parent. *Id.* These factors are not exhaustive, and it is not necessary that the Department prove all these factors "as a condition precedent to parental termination." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in the children's best

interest. *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

In addition, the Family Code sets out factors that courts should consider in determining whether a child's parent is willing and able to provide the child with a safe environment, including: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude and frequency of harm to the child; (4) whether the child has been the victim of repeated harm after the initial intervention by the Department; (5) whether there is a history of abusive or assaultive conduct or substance abuse by the child's family or others who have access to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) the willingness of the child's family to seek out, accept, and complete counseling services; (8) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and (9) whether the child's family demonstrates adequate parenting skills, including providing minimally adequate care for the child's health and nutritional needs, care consistent with the child's physical and psychological development, guidance and supervision consistent with the child's safety, a safe physical home environment, and an understanding of the child's needs and capabilities. TEX. FAM.

CODE § 263.307(b); *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018). Evidence establishing one of the predicate acts under section 161.001(1) also may be relevant to determining the best interest of the child. *C.H.*, 89 S.W.3d at 27–28.

The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re Y.G.*, No. 01-22-00181-CV, 2022 WL 3362953, at *13 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, pet. denied) (mem. op.) (citing *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *B.R.*, 456 S.W.3d at 616; *see C.H.*, 89 S.W.3d at 28 (stating that past performance as parent "could certainly have a bearing on [parent's] fitness to provide for [the child]" and indicating courts should consider prior history of child neglect in best-interest analysis).

## B.    Analysis

Multiple factors support the trial court's finding that termination of Father's parental rights to Sarah was in the child's best interest. The evidence showed that Father failed to complete all the tasks and services required in his service plan. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (holding that evidence that parent failed to complete court-ordered services can support best interest finding). While Father completed a psychosocial assessment, he did not complete any of the

recommended services such as a parenting class, individual therapy, or domestic violence classes. The plan also required Father to obtain stable housing and employment, submit to drug testing, and avoid criminal convictions. Father did not complete any of these tasks. Father's lack of employment and housing is probative of Sarah's best interest because, "[a] parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *see Holley*, 544 S.W.2d at 372 (best interest factors include stability of home and child's physical and emotional needs). Father subsequently violated the terms of his community supervision and was sentenced to eight years' imprisonment. Father did not provide for Sarah's physical or emotional needs during the case.

Father also failed to submit to the first drug test ordered by the court. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (recognizing that factfinder could reasonably infer that parent's failure to complete scheduled screening indicated she was avoiding testing because she was using drugs). Father also tested positive for drugs just one month after Sarah was born. This drug use exposed Father to the possibility of incarceration for violating the terms of his community supervision and jeopardized his ability to provide for Sarah physically and emotionally. The trial court could reasonably infer that Father

34

was at risk for continuing drug use. Father's drug use was relevant to multiple *Holley* factors, including his parenting abilities and the stability of the home as well as Sarah's emotional and physical needs now and in the future, and the physical danger in which Sarah could be placed now and in the future. *See Holley*, 544 S.W.2d at 372 (factors two, three, four, and seven).

Sarah was nearly two at the time of trial. The *Holley* factor regarding the desires of the child is neutral in this case. *See Holley*, 544 S.W.2d at 372 (factor one). Sarah's age does weigh in favor of the best-interest determination. *See* TEX. FAM. CODE § 263.307(b)(1) (providing that court may consider child's age and physical and mental vulnerabilities in the best-interest determination); *J.M.T.*, 519 S.W.3d at 270 (noting 14-month-old child's age weighed in favor of trial court's finding that termination was in best interest); *see also In re A.L.B.*, No. 01-17-00547-CV, 2017 WL 6519969, at *5 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (mem. op.) (stating children's young ages, five and six years old, rendered them "vulnerable if left in the custody of a parent unable or unwilling to protect them or to attend to their needs).

The uncontroverted evidence showed that, at the time of trial, Sarah had been with a foster family for over a year, and she was nearly two years old. Initially, Father was allowed weekly visits with Sarah, but he only attended one visit. When a child is too young to express her desires, the factfinder may consider

35

that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with her parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The witnesses testified that Sarah was bonded with the foster parent and that all Sarah's needs were met. Though Father provided a family member as a possible placement for Sarah, he did not do so until during trial. The Department conducted a home study of that relative, though the Child Advocate did not recommend moving Sarah due to her age and lack of relationship with the cousin.

On balance, the evidence showed that the applicable statutory factors and *Holley* factors weigh in favor of the trial court's best-interest finding. After viewing all the evidence in the light most favorable to the best-interest finding, we conclude that the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of the parent-child relationship between Father and Sarah was in the child's best interest.

We overrule Father's challenge to the best interest finding.

## Conclusion

We affirm the trial court's decree of termination.

Peter Kelly
Justice

Panel consists of Chief Justice Adams and Justices Kelly and Goodman.